ROSANNA TERRIO vs. FRANCIS E. McDONOUGH, JR.;
HARTFORD FIRE INSURANCE COMPANY, third-party
defendant.

Middlesex.   February 16, 1983. — June 15, 1983.

Present: BROWN, CUTTER, & KASS, JJ.

*Assault and Battery. Rape. Insurance,* Homeowner's, Insurer's obliga-
tion to defend. *Pleading, Civil,* Complaint, Theory of recovery. *Jury
and Jurors. Practice, Civil,* Challenge to jurors, View, Instructions to
jury. *Evidence,* Demonstration, Of criminal proceedings, Hospital
record, Expert opinion.

An insurer whose policyholder was named as defendant in a civil action
for assault and battery and sexual assault and battery had no obliga-
tion either to defend the action or to investigate whether the plaintiff's
claim might be within the coverage of the policy, where the complaint
alleged with precision intentional conduct which the policy expressly
excluded from coverage.  [165-169]

Discussion of the applicability of the principle articulated by the Supreme
Judicial Court in *Commonwealth* v. *Soares,* 377 Mass. 460, 480
(1979), to a claim that a party in a civil action had improperly exer-
cised peremptory challenges of prospective jurors to purge the jury of a
discrete group.  [169-172]

On the record of an action for assault and battery and sexual assault and
battery commenced by a female plaintiff against a male defendant, no
abuse of discretion appeared in the judge's overruling of the
defendant's objections to an insurer's peremptory challenge of four
male prospective jurors, resulting in a jury panel of ten women and
three men, which arguably might have been disposed to treat the
plaintiff's injuries as being intentionally inflicted by the defendant and
thus not covered by his policy of insurance.  [172-173]

At the trial of an action for assault and battery the judge did not abuse
his discretion in denying the defendant's motion that the jury view the
staircase down which the plaintiff allegedly fell.  [173]

At the trial of an action for assault and battery the judge did not abuse
his discretion in denying the defendant's motion that the jury be shown
a videotape depicting a reenactment of the plaintiff's fall. [173]

At the trial of a civil action for assault and battery and sexual assault and
battery, the judge properly excluded evidence of the defendant's ac-
quittal on criminal charges based on the same occurrence.  [173-175]

At the trial of an action for assault and battery and sexual assault and battery the judge properly excluded from the plaintiff's medical record, received in evidence under G. L. c. 233, § 79, a remark by the plaintiff's sister which contained no medical information, did not relate to the plaintiff's treatment or medical history, and possessed no characteristics justifying a presumption of reliability. [175]

At the trial of an action for sexual assault and battery, the testimony of an expert witness respecting the manner in which rape victims react psychologically to being raped was relevant to show that the plaintiff's conduct was consistent with such a reaction. [175-176]

At the trial of an action for assault and battery and sexual assault and battery, there was no evidence requiring a jury instruction with respect to negligence. [177]

A judge acted within his discretion in refusing to put written questions to the jury in a civil action. [177]

CIVIL ACTION commenced in the Superior Court Department on March 26, 1979.

The case was tried before *O'Neil, J.*

*George F. Gormley & Alice A. Hanlon* for Francis E. McDonough, Jr.

*Linda E. Giles* for Rosanna Terrio.

*John F. Kehoe* for Hartford Fire Insurance Company.

KASS, J. Without giving effect to subclassifications, the defendant McDonough argues seven categories of error in the trial of a civil action against him for sexual assault and battery and assault and battery. A jury returned a verdict of $15,000 for the plaintiff. The defendant impleaded his homeowner's insurance carrier,[1] and the trial judge directed a verdict for the insurer, Hartford Fire Insurance Company (Hartford), on the plaintiff's opening. We affirm.

An outline of the facts suffices to introduce the legal questions raised. Rosanna Terrio, the plaintiff, had a brief love affair with McDonough in May, 1977. On March 14, 1979, in the late afternoon, Terrio was driving past where McDonough lived and, on impulse, dropped in to see him. McDonough had just showered and answered the door clad

---

[1] The third-party complaint also named the insurance agent who placed the policy with the insurer as a third-party defendant. As to that party the matter was not pressed and the agent is not involved in this appeal.

in a bathrobe. After some conversation McDonough expressed his regret that he had nothing to offer for a drink. Terrio went to a nearby liquor store and returned to McDonough's apartment with a bottle of whiskey. The two shared several drinks and talked some more about old times.

Sexual intercourse followed, and the attendant circumstances are a subject which the parties sharply dispute. McDonough's testimony describes a consensual rekindling of the extinguished passion; Terrio's account described a rape. Following the sexual episode, Terrio left McDonough's apartment, which was on the second floor level of a two-family house. Terrio was scarcely out of the building when she realized she had forgotten her purse and shawl and went back up the stairs to retrieve them. In the course of that errand she talked over the telephone with McDonough's fiancée, again in circumstances which are disputed. Terrio said an angry and violent McDonough demanded that she speak with his fiancée; McDonough describes the conversation as the act of a drugged (he testified that Terrio had dosed herself with valium), drunken and malicious woman wishing to make trouble for him.

Thereafter, Terrio tumbled down the stairs and crashed through a glass panel in an exterior door at the bottom of the stairs. McDonough testified that Terrio fell; Terrio said she was pushed.

Terrio suffered two lacerations which required sutures, one on her thumb and one in the right temporal area. Examination at the Newton-Wellesley Hospital, to which McDonough took her, disclosed additional glass wounds on her lower legs and bruises on her arms and upper buttock. To the extent that it is necessary to draw on the parties' elaborate and often conflicting accounts of the events of that afternoon and evening, we shall do so in connection with the issues raised.

1. *Obligation of McDonough's Insurer to Defend.*

Terrio's complaint alleged that McDonough forced her to submit against her will to sexual intercourse and unnatural acts and that he committed an assault and battery upon her. In his answer, McDonough, in addition to denying the

allegations of the complaint, said that, if he had any responsibility at all for Terrio's plunge down the stairs, the blame was attributable to his failure to maintain his back stairs in safe condition, i.e., his negligence. Having thus raised the issue of negligence respecting his living quarters, McDonough filed a third-party complaint against Hartford.

After Terrio's opening, Hartford moved for a directed verdict on the ground that the complaint and the opening described damages arising out of conduct, viz., that defendant sexually assaulted the plaintiff and intentionally kicked her down the stairs, for which the defendant's homeowner's insurance policy did not provide coverage. Specifically, the policy disclaimed personal liability for "bodily injury . . . which is either expected or intended from the standpoint of the insured." In response to an inquiry by the judge whether Terrio waived her right to amend her complaint to include a claim for injuries resulting from a negligent act of McDonough, in addition to the claim based on his deliberate act, Terrio's counsel said that she *did* waive that right. Her position was resolute that the fall was not accidental, but the result of a purposeful push. Responding to a further question, Terrio's counsel said that so far as she knew the plaintiff was not going to adduce any evidence which would warrant recovery on a negligence theory.[2]

An insurance company's obligation to defend against a liability claim is determined by the allegations in the complaint. *Fessenden Sch., Inc.* v. *American Mut. Liab. Ins. Co.*, 289 Mass. 124, 130 (1935). *Vappi & Co.* v. *Aetna Cas. & Sur. Co.*, 348 Mass. 427, 430 (1965). *Massachusetts Turnpike Authy.* v. *Perini Corp.*, 349 Mass. 448, 457 (1965). *Barnstable County Mut. Fire Ins. Co* v. *Lally*, 374 Mass. 602, 604 (1978). Compare *Magoun* v. *Liberty Mut. Ins. Co.*, 346 Mass. 677, 681 (1964). The defendant suggests

---

[2] Terrio kept an anchor to windward. Asked by the judge if she waived the right to recover on a finding of a negligent, rather than an intentional act, she answered that she did not waive such a right and would accept an award based on negligence. No negligence question was ever put to the jury.

this line of cases ought not to survive the advent of modern pleading. The argument runs thus: if only a "short and plain statement" is required, Mass.R.Civ.P. 8(a), 365 Mass. 749 (1974); if the complaint can be liberally amended, Mass.R.Civ.P. 15(a), 365 Mass. 761 (1974); and the pleadings do not limit the theory of recovery in any event, Mass.R.Civ.P. 15(b), 365 Mass. 761 (1974), then an insurer must anticipate that, during the course of trial, the case may undergo a metamorphosis which will bring it within the coverage of the policy. This is especially so, McDonough contends, when a third-party complaint brings to the insurer's attention the issue of negligence.

Were McDonough's argument unconditionally accepted, an insurer would infallibly be bound to defend an insured no matter what the plaintiff's allegations. Although amendments to pleadings are liberally permitted, *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 761 (1978), *Geraghty* v. *Mott's Shop-Rite of Holyoke, Inc.*, 377 Mass. 911 (1979), *Wolfe* v. *Ford Motor Co.*, 6 Mass. App. Ct. 346, 354-355 (1978), the right to amend a complaint is not automatic. *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 291-292 (1977). *Genesco, Inc.* v. *Koufman*, 11 Mass. App. Ct. 986, 990 (1981). *Parkman Equip. Corp.* v. *SAS Equip. Co.*, 14 Mass. App. Ct. 938, 939-941 (1982). In a case such as the one before us, in which the plaintiff expressly disavowed a negligence theory after inquiry by the court and introduced no evidence of negligence, the prospects for a late amendment of the complaint to a negligence theory were, to put it charitably, distant.

Courts operating under notice pleading have generally determined that there is no duty to defend unless facts alleged in the complaint, or known or readily knowable by the insurer, place liability within the coverage of the policy. *McGettrick* v. *Fidelity & Cas. Co.*, 264 F.2d 883, 886 (2d Cir. 1959). *Hagen Supply Corp.* v. *Iowa Natl. Mut. Ins. Co.*, 331 F.2d 199, 203-204 (8th Cir. 1964). *C. Raymond Davis & Sons* v. *Liberty Mut. Ins. Co.*, 467 F. Supp. 17, 19 (E.D. Pa. 1979). *Healy Tibbitts Constr. Co.* v. *Foremost*

*Ins. Co.,* 482 F. Supp. 830, 837 (N.D. Cal. 1979). *Crum* v. *Anchor Cas. Co.,* 264 Minn. 378 (1963). See generally 14 Rhodes, Couch's Cyclopedia of Insurance Law § 51.45, at 479 & n.7 (2d ed. rev. 1982); 7C Appleman, Insurance Law and Practice § 4685.09 (rev. ed. 1979); Annot, 2 A.L.R. 3d 1238, 1249 (1965). *McGettrick* v. *Fidelity & Cas. Co., supra,* is instructive. There a barroom customer alleged a battery and the defendant answered that any touching of the customer was in self-defense. The court considered the purpose of the insurance policy (to protect the barroom against expected business risks) and that reasonable investigation would have established the likelihood of the defense asserted. There the difference between a covered and excluded occurrence was a close call. When, as in the instant case, the allegations lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate. *Harbin* v. *Assurance Co. of America,* 308 F.2d 748, 749-750 (10th Cir. 1962). The court in *Harbin* notes the conflict of interest created for an insurer if it is obliged to defend a case outside the scope of the policy. In the case at bar, for example, the insurer would have an interest in proving that McDonough had pushed Terrio. Compare *J. D'Amico, Inc.* v. *Boston,* 345 Mass. 218, 227 (1962), and *Magoun* v. *Liberty Mut. Ins. Co.,* 346 Mass. at 684, which observe that the insurer may be responsible for the cost of both its own defense and a separate defense for the insured where there is a potential conflict of interest.

We conclude that the adoption of notice pleading and liberal rights to amend pleadings have not altered the principle that an insurer has no obligation to defend when the allegations of a complaint describe with precision intentional conduct of a defendant which the insurance policy expressly excludes from coverage. A note of caution is in order. In cases where the disclaimer by the plaintiff of an act covered by insurance is less unambiguous, should a trial subsequently establish that the facts were other than first pleaded, i.e., that the occurrence was covered by the

policy, and should an amendment of the complaint be allowed, the insurer would be bound to indemnify the insured for the damages recovered against him and for the costs of the defense. *Harbin* v. *Assurance Co. of America*, 308 F.2d at 750. To that degree an insurer's decision not to defend is made at some peril. See, e.g., *Slavitt* v. *Kauhi*, 384 F.2d 530, 534 (9th Cir. 1967), in which, during the course of trial, the plaintiff's theory of liability changed from an intentional tort (being pushed down the stairs) to negligence (allowing the inebriated bar patron to fall down the stairs). Cf. *Magoun* v. *Liberty Mut. Ins. Co.*, 346 Mass. at 684-685. That is not the case here, where the question at all stages of the proceeding was simply whether an intentional tort had occurred.

As to McDonough's argument that, even if he intended to push Terrio down the stairs, her plunge through a glass pane at the bottom was an unanticipated accident, it is self-evident that if a person is pushed down a flight of stairs it is to be expected that person will be hurt.

2. *Improper Use of Peremptory Jury Challenges.*

Hartford exercised its four peremptory challenges (G. L. c. 234, § 29) against four men who had been provisionally seated on the jury. The next four jurors called were women, resulting in a jury composed of three men and ten women.[3] Earlier peremptory challenges by the plaintiff and McDonough had altered a jury composed on the first draw of ten men and four women to seven women and seven men. McDonough objected to Hartford's challenge of four male jurors and argued to the trial judge that the objective of diffused impartiality articulated in *Commonwealth* v. *Soares*, 377 Mass. 461, 480 (1979), had been thwarted. *Soares*, of course, was a criminal case, as have been all its

---

[3] There was one alternate juror. Prior to the challenges of counsel, fourteen jurors, including two alternates, had been drawn and provisionally placed in the jury box. When thirteen jurors had been seated, the venire was exhausted. The parties agreed to proceed to trial with thirteen jurors, although McDonough's lawyer expressly reserved his objection to the composition of the jury, which he presses on appeal.

progeny, and was based on art. 12 of the Declaration of Rights of the Massachusetts Constitution. The right to a trial by jury in civil cases has its basis in art. 15.[4]

Reasons come fairly easily to mind as to why less vigorous monitoring of peremptory challenges might be permitted in civil cases. The stakes in a criminal case are likely to be higher, jail or freedom, compared with gain or loss of property in a civil case. Criminal proceedings, for this reason, are hedged with safeguards not thought essential in civil proceedings, e.g., right to counsel, *Gideon* v. *Wainwright*, 372 U.S. 335 (1963), and the strictures on amendment of criminal complaints, *Commonwealth* v. *Snow*, 269 Mass. 598, 606 (1930), *Commonwealth* v. *Morse*, 12 Mass. App. Ct. 426, 427-428 (1981), compared with the more liberal right to amend complaints in civil cases, Mass.R.Civ.P. 15, 365 Mass. 761 (1974). Juries in criminal cases must arrive at a verdict unanimously; civil juries may arrive at a verdict supported by a stated majority of jurors, Mass.R.Civ.P. 48, 365 Mass. 812 (1974), or by agreement of five-sixths of the members. G. L. c. 234, § 34A. There is a mechanism for sequestering jurors in criminal cases provided by Mass.R.Crim.P. 20(e), 378 Mass. 892 (1979), for which there is no analogue in the civil rules. Many cases involving substantial property rights, if they require equitable relief, are not tried to juries at all.

It is possible, as well, to conjure up civil cases where the peremptory challenge of jurors on grounds of a presumed group bias in favor of the nonstriking party would be highly undesirable and, indeed, some have been reported. The issue arose in a civil action for false imprisonment and slander by a black plaintiff against a corporate defendant. See *Malvo* v. *J.C. Penney Co.*, 512 P.2d 575, 580-582 (Alaska

---

[4] The text of art. 15 is: "In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has heretofore been otherways used and practised, the parties have a right to a trial by jury; and this method of procedure shall be held sacred, unless, in causes arising on the high seas, and such as relate to mariners' wages, the legislature shall hereafter find it necessary to alter it."

1973), where the question was raised but not reached because no purposeful and systematic exclusion of a cognizable community group was shown. See in that case note 8 at page 580, quoting from *Thiel* v. *Southern Pac. Co.*, 328 U.S. 217, 220 (1946), that, "[t]he American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community." In a negligence case where the plaintiff, a longshoreman, and his witnesses were black, it was held to be error to permit an extra peremptory challenge by which the defendant struck the last black juror from the venire. *Blount* v. *Plovidba*, 567 F.2d 583, 585-586 (3d Cir. 1977). Another illustration is a civil rights action against law enforcement officials. See *Darbin* v. *Nourse*, 664 F.2d 1109, 1112-1114 (9th Cir. 1981), which did not involve removal of members of the venire by reason of their gender, race, religion, or national origin but in which the court, in analyzing the use of peremptory challenges and challenges for cause, made no distinction between civil and criminal cases. The Court of Special Appeals of Maryland has said flatly that "there is no difference in the purpose and effect of the peremptory in a civil or a criminal case." *Vaccaro* v. *Caple*, 33 Md. App. 413, 416 (1976). In Massachusetts, in the wake of *Soares*, a commentator has presented an argument for the proposition that a civil litigant is as entitled as the parties to a criminal case to a jury that is not unfairly skewed. See Boyle, The Future of Peremptory Challenges in Massachusetts, 26 B.B.J. (No. 2) 5, 6-8 (1982). Contrast Ober, How Peremptory is a Peremptory Challenge, 32 Fed'n. Ins. Couns. Q. 15 (1981). See also the dissent of Justice Richardson in *People* v. *Wheeler*, 22 Cal. 3d 258, 288 (1978). The trial judge in the instant case may have followed a cautious (and perhaps prudent) course in assuming that the Soares limitations on the exercise of peremptory challenges did apply in civil cases

and by ruling that no purposeful exclusion based on group membership had occurred.[5]

We need not, and do not, decide in this case whether the restrictions imposed on the exercise of peremptory challenges in criminal cases apply in civil cases or some civil cases. Here the trial judge rejected McDonough's objections to Hartford's peremptory challenges on the ground that the dispute over the insurance contract was sexually neutral. The reason is not without merit but may overlook an interest on Hartford's part, while still in the case, in having the jury return a verdict that the fall down the stairs was caused by an intentional tort, rather than by negligence. If so, it is possible Hartford, if it believed in the mythology of jury selection, would speculate that women would be more likely than men to return such a verdict. The judge could have rested on the lack of any pattern in the challenges his determination that McDonough had not rebutted the presumption of proper use of the peremptory challenges. See Commonwealth v. Soares, 377 Mass. at 489-490. Here the number of peremptory challenges called to the judge's attention was four, markedly fewer than the twelve of thirteen blacks challenged by the prosecution in Soares, or the nineteen of twenty-three in Commonwealth v. Gagnon, ante 110, 118 (1983). The case is more like Commonwealth v. Walker, 379 Mass. 297, 300-301 (1979), in which the court observed that a challenge of five of seven blacks, or of six out of eight, presented a less compelling showing. Moreover, the court observed in Walker, each defendant in Soares was entitled to sixteen peremptory challenges and the prosecutor was entitled to forty-eight.

---

[5] The American system of screening and manipulating the venire is not inevitable. "In England it is done differently. Twelve persons are called indiscriminately from a list of people summoned to court for jury duty and these twelve, subjected to virtually no questioning and without having revealed either their addresses or their occupations, proceed to decide the case at hand. Occasionally, it is true, a British juror proves to be the defendant's sister or is stone-deaf but, on the whole, this casual approach to the impaneling of juries has worked remarkably well." Kaplan & Skolnick, Criminal Justice 416 (3d ed. 1982).

*Ibid.* By comparison, the four challenges allowed Hartford, G. L. c. 234, § 29, afforded palpably less opportunity to purge the jury of a discrete group. On the present record, in any event, we think the judge acted within the scope of his discretion.

3. *Denial of View and Exclusion of Videotape.*

McDonough moved under G. L. c. 234, § 35, for a view of the staircase down which the plaintiff tumbled, expecting to demonstrate by an on-the-scene inspection that the plaintiff's account of her fall was improbable. The judge denied the motion, choosing to rely on eleven photographs (eight by ten) which depicted all parts of the stairway in detail. There was no abuse of the discretion reposed in a trial judge whether to order a view. *Commonwealth* v. *DiMarzo,* 364 Mass. 669, 673 (1974). *Commonwealth* v. *Curry,* 368 Mass. 195, 198 (1975).

A videotape of a reenacted fall, offered by the defendant, also met with rejection. It lies within the discretion of the trial judge to determine whether an experiment, demonstration or reenactment sufficiently resembles the actual event so as to be fair and informative. *Commonwealth* v. *Flynn,* 362 Mass. 455, 473 (1972). *Griffin* v. *General Motors Corp.,* 380 Mass. 362, 365-366 (1980). *Calvanese* v. *W.W. Babcock Co.,* 10 Mass. App. Ct. 726, 730 (1980). The excluded videotape has been viewed and reveals no abuse of discretion.

4. *Evidence of Acquittal.*

In a criminal proceeding based on the same incident, McDonough had been acquitted on three indictments. He sought to introduce the findings of acquittal and challenges their exclusion. The judge's refusal to admit evidence of the acquittals is in keeping with long standing practice in Massachusetts, based on the idea that the standards of proof and facts to be proved in a criminal case are likely to be sufficiently dissimilar from civil counterparts so that the result of one proceeding may have no probative value in another. *Fowle* v. *Child,* 164 Mass. 210, 214 (1895). *Minasian* v. *Aetna Life Ins. Co.,* 295 Mass. 1, 3 (1936). *Pilos* v. *First*

*Natl. Stores, Inc.,* 319 Mass. 475, 477-478 (1946) (which notes that actions for malicious prosecution are an exception to the general rule since a record of acquittal would be an essential part of a malicious prosecution case). Cf. *Giroux* v. *Board of Dental Examrs.,* 322 Mass. 251, 252 (1948); *Natick* v. *Sostilio,* 358 Mass. 342, 344-345 (1970).

There is no doubt the jury were aware that the plaintiff, the defendant, and certain witnesses had all been in court before in connection with a related case. The precise circumstances remained under a shroud, although the jury knew that a Newton police officer had gone to Mc-Donough's house to arrest him on a charge of rape.[6] The judge gave strong and clear instructions on the subject:

> "References may have been made. The word 'rape' was used. There were references to arrest and so on and so forth. What, if anything, may have occurred or may have happened in some other place under some other circumstances that may have in any way related to this trial and the issues that are presented to you, you can't speculate to. You have no idea and you shouldn't have any idea as to what happened.
>
> "Whether there was another hearing, what the result[] of it is, even if there were it was a hearing based on evidence that you don't know and under circumstances you don't know and under different rules than you have here and so, please don't think about that in any way. Think only of the evidence that you heard here . . . and make your decision along those lines."

---

[6] The arrest was a subject introduced by McDonough to set the stage for the following testimony:

"SERGEANT BAKER (the arresting officer): She [the plaintiff] asked me what he was wearing and I said it was a sarong or some kind of towel and with that she said, doesn't he have a beautiful body.

MR. GORMLEY: What did you say in answer to that?

SERGEANT BAKER: I just shrugged. I mean I wouldn't give an opinion on something like that."

This is a particularly apt occasion for invocation of the principle that appellate courts are to assume that the jury understands and correctly applies limiting instructions. *Commonwealth* v. *Roberts,* 378 Mass. 116, 128 (1979). *Commonwealth* v. *Dias,* 14 Mass. App. Ct. 560, 566 (1982). Compare *Commonwealth* v. *DiMarzo,* 364 Mass. at 681. The evidence of acquittal was rightly excluded.

5. *Exclusion of Hospital Records.*

After examination of medical records compiled by McLean Hospital concerning the plaintiff, the judge allowed limited portions to be read into the record under G. L. c. 233, § 79. McDonough objected to the exclusion by the judge of a comment by the plaintiff Terrio's sister, noted in those records, that Terrio "sucks blood from anything that bleeds." That remark, perhaps made in anger and in agitation, does not transmit medical information, does not relate to treatment or medical history, and possesses no characteristics justifying the presumption of reliability. It was rightly excluded under *Bouchie* v. *Murray,* 376 Mass. 524, 528 (1978). See also *Commonwealth* v. *Bohannon,* 385 Mass. 733, 749-750 (1982).

6. *Evidence Concerning Rape Trauma Syndrome.*

Apparently over objection,[7] the plaintiff introduced testimony of Ann Wolbert Burgess, interim dean of the School of Nursing at Boston University and professor and director of nursing research, concerning rape trauma syndrome, i.e. the manner in which victims react psychologically to be being raped. Dr. Burgess testified that it would "not necessarily" be remarkable for a rape victim to return to the scene with her attacker or to feel safe in his company after the event. The testimony of Dr. Burgess was cast in tentative generalities, without regard to the incident or persons involved in this case. Cross-examination revealed Dr. Burgess

---

[7] There is discussion in the record about a voir dire concerning the evidence offered, but it does not appear in the transcript furnished to us. We do not know, therefore, whether the arguments McDonough made were the same as those now made on appeal, but we are prepared to give McDonough the benefit of the doubt.

had not met the plaintiff and had only talked with her on the telephone. The defense made no motion to strike.

This was not testimony which purported to state a specific conclusion on the basis of a scientific procedure such as a blood test on a person or a test of tensile strength on a material. Compare *Commonwealth* v. *Fatalo*, 346 Mass. 266 (1963), rejecting, at that time, lie detector tests as insufficiently reliable. Dr. Burgess did not testify that Terrio had, in fact, been raped. Compare *State* v. *Saldana*, 324 N.W. 2d 227, 229-232 (Minn. 1982), rejecting testimony about rape trauma syndrome, where the expert testified that she believed the victim had been raped and had not fantasized or invented the rape. Contrast *State* v. *McGee*, 324 N.W.2d 232, 233 (Minn. 1982), decided the same day, which excluded a more general description of rape trauma syndrome and testimony that the victim's behavior was consistent with the syndrome.

Rape trauma syndrome has been recognized as a medical term which describes "disorientation and shock experienced by rape victims following a rape assault." *State* v. *Mackie*, Mont. , (1981) (622 P.2d 673, 675 [Mont. 1981]). It has been discussed in scientific literature at least since 1974, indeed in an article of which Dr. Burgess is a co-author. See, e.g., Burgess & Holmstrom, Rape Trauma Syndrome, 131 Am. J. Psychiatry 981 (1974). There was no error in admitting testimony to the general effect that medical science recognized a rape trauma syndrome and that certain kinds of conduct would be consistent with the syndrome. See *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 77 (1978). What was offered constituted specialized knowledge which held promise of assisting the jury in understanding the evidence. See Proposed Mass.R.Evid. 702 (1980). It was for the judge to pass on the qualifications of Dr. Burgess as an expert. *Campbell* v. *Thornton*, 368 Mass. 528, 541 (1975). *Worcester* v. *Eisenbeiser*, 7 Mass. App. Ct. 345, 347 (1979). McDonough's argument that he was surprised by the Burgess testimony is without merit. Her name came up in an answer to interrogatories as a potential expert witness almost a year before trial.

7. *Claimed Errors in Instructions and Questions to the Jury.*

(a)  The judge properly refused to charge the jury on negligence.  From start to finish the plaintiff's case was founded on a theory of intentional harm.  Necessarily, if the jury disbelieved the plaintiff's account of why she fell, they must have concluded that she fell accidentally.  That would not, however, lead to the conclusion that she fell by reason of the defendant's negligence.  Although photographs introduced by the defendant permitted the inference that the bottom step of his stairway was unsafe, there was no evidence offered by the plaintiff that she tripped or slipped on that step.

(b)  As to the judge's refusal to put written questions to the jury under Mass.R.Civ.P. 49(b), 365 Mass. 813 (1974), it is sufficient to say that a trial judge has wide discretion in deciding whether to use special verdicts and interrogatories pursuant to a general verdict, and the form of the questions, once the decision to put special questions is made.  *Scott* v. *Isbrandtsen Co.*, 327 F.2d 113, 119 (4th Cir. 1964).  Smith & Zobel, Rules Practice § 49.3 (1977).  See also *McCue* v. *Prudential Ins. Co. of America*, 371 Mass. 659, 666 (1976); *Everett* v. *Bucky Warren, Inc.*, 376 Mass. 280, 291-292 (1978).

(c)  We see no merit in McDonough's claim that the judge was required to instruct the jury to reduce future damages to their value at the date of commencement of the action.  See *Griffin* v. *General Motors Corp.*, 380 Mass. 362, 367 (1980).  Future damages played no role in this case.

*Judgment affirmed.*