THE COMMERCE INSURANCE COMPANY *vs.* VICTOR KOCH
& others.[1]

No. 87-314.

Worcester. December 9, 1987. — February 9, 1988.*

Present: BROWN, KAPLAN, & KASS, JJ.

*Insurance*, Motor vehicle insurance, Liability insurance, Construction of policy, Coverage. *Contract*, Insurance.

In an action by an insurer seeking an interpretation of a provision of the simplified Standard Massachusetts Automobile Insurance Policy (2d ed.) which stated that, if a "household member" legally responsible for an accident is using an automobile he does not own at the time of the accident, the owner's automobile insurance "must pay its limits before we pay" and then "we will pay, up to the limits" of the insured's policy, the judge erred in concluding that this provision in the policy was clear and unambiguous, and meant that the existence of owner's insurance on the vehicle was a condition precedent to any liability on the plaintiff insurer's part. [384-386]

Discussion of the rules of interpretation, including the applicability of the rule contra proferentem, in relation to an optional insurance policy provision whose content is not prescribed by statute. [386-388]

CIVIL ACTION commenced in the Superior Court Department on November 21, 1984.

The case was heard by *Mel L. Greenberg*, J.

*Robert W. Gardner, Jr.* (*Bruce N. Finkle* with him) for the defendants.

*Kenneth F. Rosenberg* for the plaintiff.

KAPLAN, J. Commerce Insurance Company (Commerce) is the plaintiff in this declaratory action. It seeks an interpretation of a provision of the simplified or plain-talk[2] Standard Massachusetts Automobile Insurance Policy (2d ed. 1979) as applied to the situation described in a statement of agreed facts. The facts may be summarized as follows.

On October 4, 1982, defendants' Benjamin Gray and Victor Koch were riding in a 1976 Chevrolet Monza automobile owned by Victor. These were youths seventeen years of age. They had drunk vodka before setting out. Benjamin was driving with Victor in the passenger

---

[1] Elizabeth Koch and Benjamin Gray.

[2] See G. L. c. 175, § 2B (insurance policies to be written in easily understandable form). See Alperin & Chase, Consumer Rights and Remedies § 363 (1979).

*The case was reargued on April 27, 1988, and the panel thereafter amended its opinion. The following is the opinion as so amended.

seat. The car went off the road and down an embankment and turned on its side. Alleging negligence on Benjamin's part, Victor laid claim against Benjamin for the personal injuries he had suffered in the accident.[3] At the time neither youth was licensed to drive and there was no registration or insurance covering the Monza. The license plates affixed to the car were expired; they had belonged to one Thomas Manning and covered a 1970 Chevrolet Chevelle which he had traded away; he did not know how the plates had passed to other hands. Both youths were aware that the plates were expired and were carried illegally on the Monza.[4]

Commerce sold Charles Gray, Benjamin's father, a standard policy covering his 1982 Chevrolet Impala during the year 1982. Charles had elected Part 5, "Optional Bodily Injury to Others." Part 5 stated:

> "Under this Part, we will pay damages to people injured or killed in accidents if you or a household member is legally responsible for the accident . . ..
>
> "If someone covered under this Part is using an auto he or she does not own at the time of the accident, the owner's auto insurance must pay its limits before we pay. Then, we will pay, up to the limits shown on your Coverage Selections page for any damages not covered by that insurance . . .."

It is agreed that Benjamin was a "household member,"[5] and the defendants say that, as "owner's auto insurance" on the Monza was absent and amounted to zero, Commerce was obliged to pay "up to the limits" of Charles's policy. To the contrary, Commerce says any coverage by Charles's policy was dependent on there being "owner's auto insurance" on the Monza, and here that insurance was absent.

1. The first approach to the question of interpretation must be to read this insurance policy as one would read any ordinary contract — to inquire what the simplified, conversational language of the policy would mean to a reader applying normal reasoning or analysis. See *Save-Mor Supermarkets, Inc.* v. *Skelly Detective Service, Inc.*, 359 Mass. 221, 225-226 (1971). The judge below thought the second paragraph, quoted above, was "clear and unambiguous" and would be read to mean that the existence of owner's insurance was a "condition precedent" to any liability on Commerce's part. We disagree

---

[3] Victor's mother, the defendant Elizabeth Koch, claimed consequential damages for loss of companionship and society and for emotional distress.

[4] Benjamin was convicted of operating an unregistered and uninsured car and paid a fine. (Benjamin's death after the accident was due to an unrelated cause; for convenience we refer to him rather than his representative.)

[5] Defined by the policy as "anyone living in your household who is related to you by blood, marriage or adoption."

with that conclusion. We think the reader would say at first reading that the language meant Commerce was simply to get the benefit of any owner's insurance that existed to reduce its own liability. At second reading he or she might conceive the possibility that some owner's insurance must be in force before Commerce became liable at all. However, upon consideration, this would appear a strained or curious interpretation. The reader would sense, as indeed the legal rule of interpretation suggests, that quite emphatic words are required to create a condition precedent forfeiting or limiting rights, and no such words appear here. See *Charles, Henry & Crowley Co.* v. *Home Ins. Co.*, 349 Mass. 723, 726 (1965). An interpretation that owner's insurance must have been in force is awkward because no amount is specified: insurance, if any existed, might be in any amount, small or large. On the practical side, policyholders and other insured persons under Commerce's policy would be expected from time to time to drive borrowed cars: it would not comport with common sense to say that in case of accident Commerce's exposure should turn on whether insurance on the borrowed car happened to have lapsed, or by its terms failed to cover the casualty, or did not exist for any of a number of other possible reasons. The home jurisdiction of the borrowed car involved in the accident might be one not requiring the owner by law to procure any insurance relevant to the accident, and the accident might indeed have occurred outside Massachusetts. Part 5 provides:

> "Unlike the Compulsory Part, this Part does provide coverage . . . for accidents occurring outside Massachusetts [meaning elsewhere in the United States or in Canada]."

Commerce is properly concerned that Part 5 should not be so construed as to enable a person to purchase Part 5 insurance on one car that he owns, leave uninsured (and, thereby, unregistered) one or more other cars that he owns, and then claim coverage through the policy with respect to accidents occurring in the use of those uninsured cars. Part 5 foresees this difficulty and provides against it:

> " . . . we will *not* pay:

> "3. For injuries resulting from an accident while you or a household member is using an auto either of you owns or uses regularly, unless a premium for this Part is shown for that auto on the Coverage Selections page."

Part 5 also excludes coverage of accidents by use of a stolen car:

> ". . . this Part does not pay for the benefit of anyone using an auto without the consent of the owner."

The upshot of what we take to be the natural and reasonable interpretation of the Part 5 provisions is that, as a general rule, omitting refinements, where a person insured by Commerce, using a vehicle he or she does not own, is responsible in an accident, and owner's insurance exists on that vehicle, and that insurer pays, Commerce is relieved to that extent; otherwise Commerce is bound to cover without deduction. Commerce's liability thus has some resemblance or analogy to that of a secondary insurer which is obliged to come in and pay over and above any "collectible" primary insurance. Compare *Massachusetts Insurers Insolvency Fund* v. *Continental Cas. Co.*, 399 Mass. 598, 599 n.2 (1987). Also compare *Gulezian* v. *Lincoln Ins. Co.*, 399 Mass. 606, 611-612 (1987).[6]

We gather that Commerce might reconcile itself to being held liable in a case where the insured did not know that the car he or she was driving was without insurance at the time, but it would exclude liability where the insured did know but nevertheless used the car. The difficulty with this position is that even express exceptions or exclusions are read conservatively, see *Vappi & Co.* v. *Aetna Cas. & Sur. Co.*, 348 Mass. 427, 431 (1965), and to imply a limitation on coverage without basis in the text would be very strange. If Commerce is suggesting that the fact Benjamin Gray was violating motor vehicle law at the time of the accident (as was Victor Koch) should serve as a defense to suit on Commerce's policy, the answer is given in *McMahon* v. *Pearlman,* 242 Mass. 367, 371 (1922), quoting Judge Cardozo's remark in *Messersmith* v. *American Fid. Co.*, 232 N.Y. 161, 163 (1921): "To restrict such insurance to cases where there has been no violation of criminal law or ordinance would . . . 'reduce indemnity to a shadow.' "[7]

2. We believe the foregoing interpretation of the Part 5 provisions is determinative. But if not, then we suggest the most that can be said for the insurer is that the pertinent language is ambiguous. What result should follow?

---

[6] In these cases, the primary insurers became insolvent. For a case where the insurance was not collectible because absent, see *Mid-Century Ins. Exch.* v. *State Farm Mut. Auto Ins. Co.,* 98 Ill. App. 3d 493, 494-496 (1981).

[7] To support its claimed "condition precedent" interpretation of Part 5, Commerce cites two cases which are exercises in the application of owned-vehicle provisions (see the provision commencing with "we will *not* pay," quoted in our text above): *Thomas* v. *Hartford Acc. & Indemn. Co.,* 398 Mass. 782 (1986); *Zamani* v. *Auto Club Ins. Assn.,* 124 Mich. App. 29 (1983). The third cited case is also wide of the mark of interpreting the core provision of Part 5: *Nasis* v. *American Motorists Ins. Co.,* 353 Mass. 219 (1967).

Also lacking support for Commerce's interpretation are *Cardin* v. *Royal Ins. Co. of Am.,* 394 Mass. 450, 452 (1985), and *Johnson* v. *Hanover Ins. Co.,* 400 Mass. 259, 265 (1987), cited by Commerce. These cases refer to the separate and distinct provisions for uninsured-or-underinsured coverage and do not speak at all to the present problem.

The basic rule has been that ambiguity in an insurance contract is counted strongly against the insurer. For a recent statement of the rule, see *Quincy Mut. Fire Ins. Co.* v. *Abernathy,* 393 Mass. 81, 83 (1984). However, it was early decided in the Commonwealth that where the wording or substantive content of a policy provision was fixed by statute, the strict rule contra proferentem should not apply. See *Cormier* v. *Hudson,* 284 Mass. 231, 234 (1933). Where the statute left room for an optional kind of coverage, but the terms or content of the option were not laid down, the strict rule still attached. See *Transamerica Ins. Co.* v. *Norfolk & Dedham Mut. Fire Ins. Co.,* 361 Mass. 144, 147 (1972). In *Bilodeau* v. *Lumbermens Mut. Cas. Co.,* 392 Mass. 537, 540-541 (1984), the statute prescribed for the particular point at issue (minimum amounts of coverage required "per person" and "per accident"), and so the decision not to bring the strict rule to bear conformed pretty well to earlier authority. But the court spoke in large terms: "Because the language of the standard policy is prescribed by statute and controlled by the Division of Insurance rather than the individual insurer, the rule of construction resolving ambiguities in a policy against the insurer is inapplicable."[8] Further, we must observe that there is some recent suggestion (although not a holding) that the strict rule is inapplicable where the Commissioner of Insurance has approved a policy under his general power, even if the pertinent provision of the policy has not been prescribed in words or substance by a statute. Thus in *Moore* v. *Metropolitan Property & Liab. Ins. Co.,* 401 Mass. 1010, 1011 (1988), the court said: "We also note that, because the policy language is controlled by the Commissioner of Insurance and not the insurer, 'the rule of construction resolving ambiguities in a policy against the insurer is inapplicable.' See *Bilodeau* [*, supra* at 541]."[9]

Our present case involves optional provisions whose content is not prescribed by statute, hence by reference to the *Transamerica* case, *supra,* ambiguities should be construed against Commerce; and *Bilodeau* on its facts — overlooking the breadth of its expression — would not be to the contrary. But if *Moore* is accepted in sweeping style, the net result should be the same. Where ambiguities are not cast against the insurer, then, according to the further statement in *Bilodeau,* "we must ascertain 'the fair meaning of the language used,

[8] As to the requirement of official approval of policies, see G. L. c. 175, §§ 2B, 113A. A "standard" policy in this context appears to differ from an ordinary approved policy only in that it is the only form approved in a particular field.

[9] This may lead to the thought that the courts in such cases should consider how far the insurers in fact took part in influencing the policy form. Cf. *Lumbermens Mut. Cas. Co.* v. *DeCenzo,* 18 Mass. App. Ct. 973, 975 (1984), *S.C.,* 396 Mass. 692 (1986).

as applied to the subject matter.'" 392 Mass. at 541.[10] What we have said in our point 1 above should be enough to show that the indicia of "fair meaning" preponderate here in favor of the insureds. And if, indeed, the Part 5 provisions are thought irretrievably and incurably ambiguous and "fair meaning" in the sense of such preponderance is not ascertainable, then the insureds are still favored; this would follow from common sense considerations of equity and of the ability of insurers to spread the losses as well as to advocate and secure changes in the policy terms, if they are warranted.[11]

The judgment appealed from is reversed, and judgment will be entered declaring the rights of the parties in accordance with the foregoing opinion.

*So ordered.*

---

[10]The quoted words are taken from *Save-Mor Supermarkets, Inc., supra* at 226, which in turn quotes from earlier authority. Such statements commonly appear where the rule contra proferentem is not applied. See, e.g., *Johnson, supra* at 266.

[11]"*Reasonable Expectations.*" Although unnecessary to decision herein, we mention the emergent doctrine, as summarized by R. Keeton, Insurance Law 351 (1971): "The objectively reasonable expections of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." Our courts have been receptive to the proposition, although its shape has not been finally settled. See *Bond Bros.* v. *Robinson,* 393 Mass. 546, 551 (1984); *Home Indem. Ins. Co.* v. *Merchants Distribs., Inc.,* 396 Mass. 103, 107 (1985).

In *Moore, supra* at 1011, the court said in finding the doctrine inapplicable to the particular situation, "We have no evidence of any expectations of the insured . . . nor do we have any indication whether any expectations he may have had were reasonable." Presumably the court did not mean evidence in the sense of legal proof. If the concept is to have practical consequences, it must operate on the basis of reasonable inference from the total situation. In the present case we can say with confidence that a policyholder purchasing the optional Part 5 would expect, in reason, that his coverage would extend, generally, where he (or another insured) was using a borrowed car. This is the key to expectation. He would think it unreasonable, an unfair deal, to find that his insurer could renounce all liability on its own policy because of the adventitious circumstance that owner's insurance on the borrowed car was lacking.