SMARTFOODS, INC., & others[1] *vs.* NORTHBROOK PROPERTY
AND CASUALTY COMPANY & others.[2]

No. 92-P-897.

Middlesex. May 12, 1993. - August 26, 1993.

Present: BROWN, KASS, & LAURENCE, JJ.

*Insurance*, General liability insurance, Insurer's obligation to defend, Construction of policy, Coverage. *Contract*, Insurance. *Words*, "Occurrence," "Property damage."

Claims in a breach of contract action did not arise out of an "occurrence," nor was the injury allegedly suffered either "property damage" or "advertising injury," within the meaning of the terms of a comprehensive liability insurance policy [241-245]; nor was there any ambiguity in the policy that would place the claims within the scope of the policy [245].
Comprehensive liability insurance policies issued for periods running from 1985 to 1988 did not cover alleged injuries occurring in 1989. [245-246]

CIVIL ACTION commenced in the Superior Court Department on May 4, 1990.

The case was heard by *J. Owen Todd*, J., on a motion for summary judgment.

*Daniel L. Goldberg* (*Lawrence S. Buonomo* with him) for the plaintiffs.

*William H. Clancy* for Northbrook Property and Casualty Company.

*John P. Graceffa* for American Motorists Insurance Company.

KASS, J. Seven distributors of cheese popcorn products for Smartfoods, Inc. (Smartfoods), each brought separate actions against Smartfoods after Smartfoods cancelled distribu-

---

[1]Kenneth Meyers, Frito-Lay, Inc., and Frito-Lay Acquisition Corp.
[2]Allstate Insurance Company, as successor to Northbrook Property and Casualty Company, and American Motorists Insurance Company.

tion arrangements with them. The distributors alleged the conventional panoply of grievances: breach of contract; breach of implied covenant of good faith and fair dealing; unfair and deceptive trade practices (G. L. c. 93A); tortious interference with contractual and advantageous relations; and misappropriation of trade secrets. Smartfoods tendered defense of those actions to its general liability insurance carriers, who disclaimed coverage.

In the case before us, Smartfoods sought a declaratory judgment concerning the duty of the insurers to defend under their respective insurance contracts. Smartfoods' complaint also asked damages for breach of contract and unfair settlement practices (G. L. cc. 93A and 176D). A judge of the Superior Court took the case on cross motions for summary judgment and allowed the motions of the insurers, i.e., he decided that the insurers did not, under their respective policies, have a duty to defend the actions brought against Smartfoods by the distributors. We affirm for reasons substantially the same as those advanced by the motion judge in his memorandum of decision.

In considering this case, we are not concerned with the merits of the actions brought against Smartfoods by the distributors.[3] Our inquiry is whether "the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered" by the terms of the insurance policies. *Sterilite Corp.* v. *Continental Cas. Co.*, 17 Mass. App. Ct. 316, 318 (1983). See also *Continental Cas. Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 146-147 (1984); *Boston Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.*, 406 Mass. 7, 12-13 (1989); *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 166-169 (1983); *Wolov* v. *Michaud Bus Lines, Inc.*, 21 Mass. App. Ct. 60, 62-63 (1985); *Peerless Ins. Co.* v. *Hartford Ins. Co.*, 34 Mass. App. Ct. 534, 536 (1993).

---

[3]In the only one of the seven distributor cases that went to judgment, the judge ruled in favor of Smartfoods on all counts. Shortly before that decision, made on a defense motion for summary judgment, the other six cases were settled.

Guided by those principles, we turn to the lead distributor's complaint, that of Utt Distributing Co., Inc. (Utt), which the parties agree serves as a template for the other six. Utt says that Smartfoods, when Utt first encountered it, was a start-up company with a promising new snack product but no track record or distribution experience. Distributors could help Smartfoods obtain shelf space in stores and supermarkets and eliminate the need for local advertising. To potential distributors, including Utt, Smartfoods touted not only the merits of its product but also its intention to deal exclusively with Utt in its market area so long as Utt did well with the Smartfoods product line. In reliance on Smartfoods' representations, Utt ceased distributing another brand of popcorn, bought floor racks for installation in stores, shared the expense of providing free product samples to retailers, hired an upper-level manager, purchased a new motor vehicle to be used in the sales effort, and engaged in other marketing efforts.

The success of Smartfoods' product in the marketplace was such that it became a merger candidate. In 1989, Frito-Lay, Inc., more specifically Frito-Lay Acquisition Corp., acquired all the stock of Smartfoods. Frito-Lay, which now owned Smartfoods as a wholly-owned subsidiary, had its own distribution system and caused Smartfoods to terminate its existing distribution agreements, effective thirty days after termination notice. All the distributors had done well and, at the time of cancellation, were doing well with the Smartfoods product.

Although it requires a flight of the imagination to suppose that when Smartfoods bought general liability insurance it expected that the policy would cover legal expenses incident to what, notwithstanding the numerous counts, is at its core a breach of contract suit, our task is to match the complaint against the policies. We begin with the policy issued by American Motorists Insurance Company (AMIC).

The first coverage in the AMIC policy under which Smartfoods claims is the property damage coverage (coverage B), which applies to damage caused by an "occurrence."

An "occurrence" under the policy means "an accident . . . which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Assuming, only for sake of discussion, that the distributors had suffered property damage within the meaning of the policy, the termination of the distribution agreements was not an "accident," a word which, by definition, implies the unexpected. See American Heritage Dictionary 11 (3d ed. 1992); Oxford English Dictionary 14 (Compact ed. 1971). Rather, the termination of the agreements was a calculated business decision by Smartfoods itself. Nor was the resulting harm to the distributors, loss of profits and at least temporary excess capacity in personnel and equipment, unexpected or unintended by Smartfoods. Some degree of intangible harm of that sort was inevitable, and the case falls outside of such as *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 84 (1984), which held that a volitional act may nonetheless be accidental, in an insurance policy context, if the insured did not specifically intend to cause the harm that occurred or was not substantially certain the harm would occur. If, however, an insured knows with substantial certainty that harm will follow from his conduct, like setting a fire, it is not necessary that he gauge the degree of harm with precision. *Newton* v. *Norfolk & Dedham Mut. Fire Ins. Co.*, 26 Mass. App. Ct. 202, 203-205 (1988), *S.C.*, 404 Mass. 682 (1989), and cases and authorities there cited. See also *Terrio* v. *McDonough*, 16 Mass. App. Ct. at 169 (if a person is pushed down a flight of stairs it is to be expected that person will be hurt). The damage claimed by the distributors, therefore, does *not* fall within the meaning of an "occurrence"; the damage, on the other hand, *does* fit the exclusion from coverage of damage from conduct and results which the insured intended.

That is not the end of the story. "Property damage," under the policy, means, in the first instance, "physical injury to or destruction of tangible property." There was no such injury or destruction. The phrase "property damage" also means "loss of use of tangible property which has not been physi-

cally injured or destroyed provided such loss of use is caused by an occurrence. . . ." Smartfoods attempts to fit into the "loss of use" category the distributors' claim that they were entitled to damages because Smartfoods' cancellation left them with surplus display racks and excess capacity in a van and five trucks bought to help handle the Smartfoods product. To cast an insufficiency of demand for the use of property to its fullest potential as a loss of use of that property is an exercise in turning language inside out. The property was there to be used. Economic loss incident to inability to exploit that available property profitably is not within the scope of property damage coverage. See *Lassen Canyon Nursery, Inc.* v. *Royal Ins. Co.*, 720 F.2d 1016, 1018 (9th Cir. 1983). Moreover, under the policy, the loss must be a result of an "occurrence," and, as we have seen, there was no "occurrence" in the policy sense.[4]

If the complaints of the distributors cannot be read as stating a claim of damage to *property* within the meaning of the AMIC policy,[5] Smartfoods argues that the complaints can nevertheless be made to implicate the "advertising injury" coverage. "Advertising injury," for purposes of the policy, means "injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan."

In ordinary usage, never a bad start for analyzing what words signify, see *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. 318, 324 (1991), advertising means a public announcement to proclaim the qualities of a product or point of view. *Playboy Enterprises* v. *St. Paul Fire & Marine Ins. Co.*, 769 F.2d 425, 429 (7th Cir. 1985). American Heritage Dictionary 26 (3d ed. 1992). Webster's

---

[4]There is no reason to dwell on a still more attenuated loss of use claim having to do with shelf space the distributors had persuaded retailers to allocate to Smartfoods product. The shelf space belonged to the retailers, and any interest the distributors had in it was entirely intangible.

[5]We use the singular, although separate policies were issued for successive years.

Third New Intl. Dictionary 31 (1971). See *National Union Fire Ins. Co.* v. *Siliconix Inc.*, 729 F. Supp. 77, 80 (N.D. Cal. 1989). Wide dissemination of information is typically the objective of advertising. The communication referred to in the Utt complaint which Smartfoods seeks to characterize as advertising is a letter of March 12, 1985, by Smartfoods to Utt[6] that solicits the participation of Utt as a distributor in marketing the Smartfoods product. Such a proposal to a particular company to do business together does not conform to ordinary notions of calling to the attention of the public the merits of a product. We have considered but view as unpersuasively reasoned the opinion in *John Deere Ins. Co.* v. *Shamrock Indus.*, 696 F. Supp. 434, 439-440 (D. Minn. 1988), in which three letters extolling the virtues of a pail filling machine were taken as advertising activity for purposes of construing the insurance policy there involved. We doubt that every pitch made by one businessman in a letter to another constitutes advertising as the word is understood in American usage.

The Superior Court judge in considering the advertising injury theory of coverage looked to the injury that might arguably have flowed from advertising activity, had there been any. That injury was not libel, slander, defamation, violation of right of privacy, infringement of copyright, title or slogan, or piracy. Of the wrongs recited in the policy as within the scope of its coverage, that left unfair competition. Unfair competition, in its common law signification, implies palming off. See *Kazmaier* v. *Wooten*, 761 F.2d 46, 52 (1st Cir. 1985). Such was not the nature of the distributors' grievance, which was that their distribution agreements had been unlawfully terminated in light of inducements allegedly made by Smartfoods when the agreements were entered into. That might fall within the wide enclosing arms of unfair business practices under c. 93A, but the policy does not refer to either that phrase or the statute. We think the judge's reason-

---

[6]The Utt complaint alleges that identical letters were sent to other distributors who were in the network of Wise (a brand of snack foods) Dealers of New England.

ing provides a persuasive independent ground for concluding that the allegations of the Utt complaint cannot reasonably be read as falling within the advertising injury coverage.

Common sense is not a stranger to the interpretation of insurance policies, see *Wolov* v. *Michaud Bus Lines, Inc.*, 21 Mass. App. Ct. at 63. Fairly read, we do not think an ambiguity can be found in the AMIC policy provisions that, resolved against the author of the policy, would place the distributors' grievance within the scope of the policy. See *Commerce Ins. Co.* v. *Koch*, 25 Mass. App. Ct. 383, 387 (1988). Insofar as the emergent doctrine of reasonable expectations may have any application, see *id.* at 388 n.11, we do not suppose that a vendor of a food product, when purchasing comprehensive liability insurance, expects that it will cover legal costs attendant on commercial disputes with, for example, its distributors which arise out of their contractual arrangements rather than from the actual purveying of the product. That would transform the policy to comprehensive litigation insurance.

The insurance policies issued by Northbrook Property and Casualty Company (Northbrook) were issued for periods running from April 16, 1985, to April 16, 1988. Injuries covered by the policy must occur during the policy period. The act of Smartfoods complained of, the termination of the distributorship agreement, occurred in 1989. During the intervening period, i.e., during the period the Northbrook insurance was in force, Utt and the other distributors, far from suffering any injuries arising out of their relationship with Smartfoods, were enjoying profits from it. Although the actions that Smartfoods seeks to characterize as advertising activity, the proposal letter by Smartfoods to the distributors, may have occurred during the policy period of the first policy issued by Northbrook, the complaining parties were not damaged until 1989. Generally, within the meaning of a comprehensive liability policy, it is the time of damage that is material; i.e., the occurrence takes place when the complaining party actually is injured. *Continental Cas. Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 152 (1984). *Frohberg* v. *Merri-*

*mack Mut. Fire Ins. Co.,* 34 Mass. App. Ct. 462, 464 (1993). In addition, we may add that the text of the North-brook policy, although not identical to the AMIC policy, is sufficiently similar so that the reasoning we applied to the AMIC policy would apply to the Northbrook policy.

*Judgment affirmed.*