UTICA MUTUAL INSURANCE COMPANY *vs.* JOHN HAMEL, trustee.[1]

No. 97-P-1404.

Middlesex. December 15, 1998. - April 8, 1999.

Present: BROWN, PORADA, & GREENBERG, JJ.

*Insurance,* General liability insurance, Construction of policy, Coverage. *Contract,* Insurance. *Words,* "Occurrence."

A policy of comprehensive general liability insurance did not cover a judgment obtained by a landlord for damage to its building by the tenant insured's continuous and extensive waste water overflows, where the damage caused by the tenant's operations was "expected or intended" under the policy, as a matter of law, and was thus excluded from coverage. [624-626]

CIVIL ACTION commenced in the Superior Court Department on January 18, 1994.

The case was heard by *Hiller B. Zobel,* J., on motions for summary judgment.

*Thomas J. Gleason* for the defendant.

*John A. Sakakeeny & Laurie J. Condos,* for the plaintiff, submitted a brief.

GREENBERG, J. The plaintiff, Utica Mutual Insurance Company (Utica), sought a declaration that a comprehensive general liability policy purchased by its insured, Printed Circuit Design, Inc. (PCD), did not cover a $300,000 judgment obtained against PCD by the Polymer Realty Trust (Polymer). In dealing with this case, we revisit the question of the meaning of an "occurrence," which is defined in the policy as "neither expected nor intended from the standpoint of the insured."[2] A judge of the

[1]Of the Polymer Realty Trust.

[2]The description of property damage coverage in the policy reads, in pertinent part, "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because

Superior Court, on cross motions for summary judgment, found beyond question that PCD should have anticipated that its inadequate waste water disposal system would damage Polymer's building. As such, he concluded that Polymer's damage award was not covered by the policy. We agree, following the precepts of *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 86 (1984).

The materials which the defendant furnished in support of its motion for summary judgment included portions of transcripts from the trial of the underlying case.[3] From these materials, the following undisputed facts appear.

PCD, a circuit board manufacturer, leased the fifth floor of an old mill building owned by Polymer in July, 1986. A final step of its manufacturing operations required its employees to coat circuit boards by placing them in fifteen to twenty tanks filled with liquified chemicals. A rather rudimentary waste water treatment system was in place; it consisted of arranging the tanks in a step-down position so that displaced water would flow from one to the other by force of gravity. The tanks were filled to the brim with water. They sat upon a wooden floor covered only by a coat of gray epoxy paint.

Regular spills of water occurred at PCD's fifth floor plant beginning in May of 1987. As PCD increased productivity, the spills became more frequent. Polymer's John Hamel first spoke with Charles St. Aubin, one of the officers of PCD, in May, 1987. From the time the spills began until the fall of 1987, token efforts to absorb the water by wet vacuum pumps and drying machines proved futile. Water was continually overflowing from tanks on the fifth floor, leaking through to floors below. Even though rubber mats had been placed on the floor so that PCD's workers would not be forced to slosh around the tanks,

of [property damage] to which this insurance applies, caused by an occurrence." The definition section of the policy defines occurrence as "an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured."

[3]As will be seen, Polymer brought suit in 1989, alleging that PCD spilled water, chemicals, and/or hazardous waste on numerous occasions during the course of its business operations, causing extensive damage to five floors of Polymer's building. Utica defended PCD under a reservation of rights. A Superior Court jury, on June 8, 1994, returned a verdict for Polymer in the amount of $300,000. On February 17, 1995, Utica's declaratory judgment action was consolidated with a separate G. L. c. 93A claim.

St. Aubin acknowledged that the tanks "were overflowing" and the plant "was getting drowned with water."

In the fall of 1987, Polymer's employees found floors cracked and warped on all five stories of the building. Repeated discharges of water made matters worse. Two to three inches of water constantly pooled on the floors below the fifth floor. During this time, St. Aubin continued to assure Hamel that the problem would be corrected. In October, 1988, PCD installed sealed and bermed floors using an epoxy cement mixture. The measure proved too little, too late. Hamel testified that one of PCD's owners told him that PCD used 35,000 gallons of water per day; PCD's waste water system was equipped to handle 4,500 gallons. Waste water began to move horizontally causing extensive portions of the fifth floor to become water-soaked. In addition, many of the floor areas had not been painted or sealed to prevent leakage to the floor below. As early as November, 1986, PCD was informed by a municipal inspector that its waste treatment system was inadequate. The underlying action against PCD ensued in 1989.

The motion judge, relying on *Smartfoods, Inc.* v. *Northbrook Property & Cas. Co.*, 35 Mass. App. Ct. 239, 242 (1993), declared that the damage caused by PCD's operations was excluded by the policy because "it was substantially certain, as a matter of law, that some harm would occur." The policy provided coverage for property damage for "an accident, including continuous or repeated exposure to conditions . . . *neither expected nor intended from the standpoint of the insured*" (emphasis supplied). See note 2, *supra.* The judge also noted that, although issues of intent are ordinarily inappropriate for disposition on summary judgment, there was sufficient evidence, as a matter of law, to demonstrate that "PCD expected or intended the ensuing harm."

Polymer contends that when waste water initially overflowed PCD's tanks in 1987, PCD could not have been "substantially certain" that its conduct would cause harm to the building. To the contrary, Polymer did not furnish to the motion judge any materials from the underlying case that show any uncertainty that PCD's conduct caused the overflows and consequent damage. Moreover, Polymer failed to make any showing that the initial incidents of water overflow were only a "de minimis cause of [PCD's] liability." See and contrast *Highlands Ins. Co.* v. *Aerovox Inc.*, 424 Mass. 226, 235 (1997).

This case is removed from the ordinary question whether the insured intended by his or her volitional act to cause the injury that gave rise to the underlying personal injury or property damage claim. Compare *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. 393, 399 (1990); *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 169 (1983); *Newton* v. *Norfolk & Dedham Mut. Fire Ins. Co.*, 26 Mass. App. Ct. 202, 203 (1988), *S.C.*, 404 Mass. 682 (1989); *Preferred Mut. Ins. Co.* v. *Gamache*, 42 Mass. App. Ct. 194, 202, *S.C.*, 426 Mass. 93 (1997).[4] As the motion judge wrote, "[h]ere no one alleges that PCD specifically intended to damage Polymer's building." Rather, the question is whether "the insured knew or should have known that there was a 'substantial probability' that certain results would ensue." *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. at 85.

The record establishes that Polymer's property damage claim was inherently predictable by 1988. The materials furnished to the judge included testimony of James Michitson, an environmental chemist employed by the city of Haverhill, who inspected PCD's waste water treatment system in 1987 and cited PCD for failure to comply with applicable environmental regulations. As a result of an earlier inspection he conducted in November, 1986, PCD had been ordered to seal the fifth floor to contain spills from the waste water treatment tanks. Nothing was done for two years. In 1988, both municipal and State inspection agencies issued orders that PCD upgrade its waste water system. These facts amply demonstrate, as the motion judge correctly concluded, that at a minimum PCD knew to a substantial certainty that its continual waste water spills would cause "some damage" to Polymer's premises.

In *Smartfoods, Inc.* v. *Northbrook Property & Cas. Co.*, 35 Mass. App. Ct. 239 (1993), the insured sought a declaratory

---

[4]It is perhaps worth noting here that decisional law, at least at the time the motion judge decided the instant case, had developed a two-pronged approach for the application of exclusionary clauses for intentional injury in various circumstances. The first "strand" is to ascertain whether an intent to cause injury exists as a matter of law. *Hanover Ins. Co.* v. *Talhouni*, 413 Mass. 781, 784 (1992). See *Nashua Corp.* v. *First State Ins. Co.*, 420 Mass. 196, 204 (1995). Short of deliberate conduct to cause harm, the second part of the inquiry requires a factual determination as to "whether . . . the [insured] intended, or knew with substantial certainty, that some injury would result from his conduct." *Hanover Ins. Co.* v. *Talhouni*, 413 Mass. at 785, quoting from *Kowalski* v. *Gagne*, 914 F.2d 299, 304 (1st Cir. 1990).

judgment concerning the duty of various insurers to defend it under respective insurance policies which it argued covered various tort and contract claims brought against it by seven distributors of its cheese popcorn products. The definition of "occurrence" was identical to the one involved in the instant case. We held that termination of a distribution agreement did not constitute an accident. Consistent with the premise that the resulting harm to the distributors (loss of profits and at least temporary excess capacity in personnel and equipment) could not be deemed to be unexpected and unintended by the insured, this court in *Smartfoods*, 35 Mass. App. Ct. at 242, stated, "[i]f, however, an insured knows with substantial certainty that harm will follow from his conduct, like setting a fire, it is not necessary that he gauge the degree of harm with precision." By analogy, given the continuous and extensive nature of the spills and leaks described by the summary judgment materials in this case, the inevitability of harm seems plain. Therefore, we conclude that the damage to Polymer's premises falls outside of the meaning of an occurrence as defined by the *Abernathy* case.

*Judgment affirmed.*