Gants, J.
In October 1996, the defendant, First Kostas Corporation (“First Kostas”), a painting contractor, contracted with the defendants, Carol Goss and Donald Strauss (“the claimants”), to paint the exterior of their two-family duplex located at 28-30 Shepard Street in Cambridge. Ms. Goss and Mr. Strauss contend that First Kostas contaminated their property with lead when it scraped off the old paint chips in preparing their house for this painting job, and have notified First Kostas of their intention to take legal action against it to recover the damages caused by the contamination. First Kostas’s insurer, the plaintiff Dorchester Mutual Fire Insurance Company (“Dorchester”), then brought this declaratory judgment action against its insured and the claimants seeking a judicial declaration that it has no obligation under its policy to defend First Kostas or to indemnify it for these claims. Both Dorchester and the claimants then filed cross motions for summary judgment.
BACKGROUND
It is undisputed that, on or about October 8, 1996, the claimants executed a contract with First Kostas in which, in return for $6,250, First Kostas would scrape off the old paint on the exterior of their home, as needed, and repaint it, first with a coat of oil base primer and then with a coat of oil base paint. First Kostas performed this job. The claimants contend that *189 the quality of the painting job was satisfactory but that First Kostas allowed dust and paint chips containing high levels of lead to enter and contaminate their home. They claim that they were forced to vacate their home for more than two weeks to permit a professional hazardous waste company to remediate the alleged contamination. On February 7, 1997, their attorney sent First Kostas a demand letter under Chapter 93A, Section 9, claiming $ 19,000 in damages. As of the date the cross-motions were argued, the claimants had yet to file a complaint in court against First Kostas.
There is no dispute that First Kostas was insured at the time both of the occurrence of the incident and the claim under a Small Contractors Policy issued by Dorchester (“the Policy”). Under this Policy, Dorchester agreed to pay all sums that First Kostas “becomes legally obligated to pay as damages because of . . . ‘property damage’... to which this insurance applies” and “to defend any ‘suit’ seeking those damages.” Policy at 1. The Policy provided that the insurance applied to property damage caused by an “occurrence” that took place in the “coverage territory” during the “policy period.” Policy at 1. When one incorporates the definitions of these terms of art included within the Policy, the Policy provided coverage for:
1. “Physical injury to tangible property, including all resulting loss of use of that property,” as well as the loss of use “of tangible property that is not physically injured;” (Policy at 12);
2. Caused by “an accident, including continuous or repeated exposure to substantially the same general harmful conditions;” (Policy at 11);
3. That took place between June 30, 1996 and June 30, 1997 in the United States (Policy at 9).
There is no dispute that, unless a Policy, exclusion were applicable, at least some share of the damages claimed by the claimants are covered by the Policy.
The Policy, however, does provide a substantial number of exclusions, and Dorchester correctly contends that any one of them is sufficient to bar coverage in this case. First are the pollution exclusions, which contain two separate exclusions:
1.Section B(l)(f)(l) excluded any properly damage “arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants” under certain limited circumstances , • specifically:
a. “At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;”
b. “At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;”
c. “Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured . . . ;” or
d.“At or from any premises, site or location on which any insured . . . [is] performing operations:
I. If the pollutants are brought on or to the premises, site or location in connection with such operations by such insured . . . ; or
II. If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants." Policy at 3.
2.Section B(l)(f)(2) excluded “[a]ny loss, cost or expense arising out of any [r]equest, demand or order that any insured or others test for, . . . clean up, remove, ... or in any way respond to, or assess the effects of pollutants.” Policy at 3.
“Pollutants” are defined to mean “any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.” Policy at 3.
Second, the Policy contained at least four exclusions for property damage resulting from the faulty workmanship of the insured:
1. Section B(l)(k)(5) excluded “property damage to that particular part of real property on which [the insured] ... is performing operations, if the property damage arises out of those operations;” Policy at 4;
2. Section B(l)(k)(6) excluded “property damage to that particular part of any property that must be restored, repaired or replaced because [the insured’s] work was incorrectly performed on it; Policy at 4;
3. Section B(l)(m) excluded property damage to the insured’s completed “work,” defined as “work or operations performed by the insured,” that arose “out of it or any part of it;” Policy at 4, 11; and
4. Section B(l)(n) excluded property damage to “ ‘impaired property’ or property that has not been physically injured, arising out of a defect, deficiency, inadequacy or dangerous condition in . . . [the insured’s] work.” Policy at 4. “Impaired property” is defined as “tangible property, other than .. . [the insured’s] work, that cannot be used or is less useful because it incorporates . . . [the insured’s] work that is known or thought to be defective, deficient, inadequate or dangerous, or [because the insured has] failed to fulfill the terms of a contract or agreement.” Policy at 10.
DISCUSSION
The first issue before this Court is whether Dorchester has a duty to defend First Kostas under the Policy. Indeed, this is the sole issue if it is determined that there is no duty to defend, because the duty of an insurer to defend a claim is far broader than its duty to indemnify. Long, The Law of Liability Insurance at 5-4 (1983). “[I]f the allegations of the complaint are ‘reasonably susceptible’ of an interpretation that they state ... a claim covered by the policy terms, the insurer must undertake the defense. See Vappi & Co. v. Aetna Casualty & Sur. Co., 348 Mass. 427, 431 *190 (1965); Magoun v. Liberty Mut. Ins. Co., 346 Mass. 677, 681-82 (1964); Terrio v. McDonough, 16 Mass.App.Ct. 163, 166 (1983).” Continental Casualty Co. v. Gilbane Bldg. Co., 391 Mass. 143, 146-47 (1984), quoting Sterilite Corp. v. Continental Casualty Co., 17 Mass.App.Ct. 316, 318 (1983). An insurer has a duty to defend “whenever there is a possibility of coverage, even when that possibility is remote.” Long at 5-7. As a result, in determining whether the insurer has a duty to defend, all reasonable doubts as to whether that duty exists are resolved against the insurer and in favor of the insured. Long at 5-4.
Moreover, in construing the language of an insurance policy, I must “consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.” Atlantic Mutual Insurance Co. v. McFadden, 413 Mass. 90, 92 (1992) quoting Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 700 (1990). This focus on the reasonable understanding of the insured reflects not only the legal principle that the insurer wrote the policy and any ambiguity in its language must be resolved against the drafter. See Quincy Mutual Fire Insurance Co. v. Abernathy, 393 Mass. 81, 83 (1984). It also reflects the practical recognition that, if an insured reasonably believes that a risk is covered by an insurance policy, it is unlikely to seek other coverage to protect against that risk. Therefore, since the insured may reasonably have relied on the policy language to forego other coverage, the insurer that induced such reliance by its careless use of language should be obliged to cover that risk. In short, it is important that the insurer make its insurance policy clear as to what risks are covered and what are not so that, when a risk is not covered, an insured can make an informed decision to leave that risk uninsured or to seek additional coverage. Ambiguity in an insurance policy begets both litigation and the potential for economic catastrophe from uninsured risks, and the party responsible for any ambiguity is the insurer who wrote the policy.
Since one applicable exclusion would be sufficient to bar coverage, I need to consider each exclusion in turn, applying the generous legal standard described above. For the reasons described below, I find that the pollution exclusion does not relieve Dorchester of its duty to defend and indemnify, but that at least one of the faulty workmanship exclusions does.
III. The Pollution Exclusion
In 1992, the Supreme Judicial Court in Atlantic Mutual Insurance Company v. McFadden held, in a case arising out of the lead poisoning of two children from lead paint in a residence, that a pollution exclusion nearly identical to that found in this Policy did not apply to lead-paint related injury in a residence. 413 Mass. at 92. The Corut declared “that an insured could reasonably have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence.” Id It found that the definition of “pollutant” under the policy did not include “leaded materials," but was intended instead to encompass “damage or injury caused by improper disposal or containment of hazardous waste.” Id It concluded, “There simply is no language in the exclusion provision from which to infer that the provision was drafted with a view toward limiting liability for lead paint-related injury.” Id
Three years later, in United States Liability Insurance Company v. Bourbeau, the First Circuit held that a pollution exclusion provision plainly barred insurance coverage in a fact situation nearly identical to that in the instant case. 49 F.3d 786 (1st Cir. 1995). In Bourbeau, a painting contractor stripped and painted two town buildings, and contaminated the surrounding soil with paint chips containing lead, thereby necessitating an environmental clean-up that cost the town $50,000. 49 F.3d at 787. The First Circuit ruled that an objectively reasonable person would consider lead paint to be both a “solid . . . contaminant” and a “toxic chemical” within the meaning of the policy, and lead paint chips to be “materials to be disposed of’ or “waste.” The First Circuit recognized that it was bound by the Supreme Judicial Court’s interpretation of the term “pollutant” in McFadden, but determined that McFadden was “inapposite” to the facts of Bourbeau:
. . . McFadden was not an environmental pollution case. McFadden concerned personal injury caused by the presence of lead paint in a household. This case concerns injury to property caused by the alleged negligent discharge of lead paint onto property. The latter is a classic example of “pollution” — the discharging of a harmful substance onto land — while the former is demonstrably not. An objectively reasonable person simply would not ascribe the word “pollution” to the presence of lead paint in a house.
Id. at 789 (emphasis in original).
Not surprisingly, the claimants rely on McFadden, while Dorchester argues Bourbeau’s distinguishing of McFadden. Indeed, Dorchester maintains that Bourbeau stands for the proposition that a hazardous substance may not be a “pollutant” when it is in situ but becomes a pollutant when it is released.
I do not believe that such a proposition reflects Massachusetts law as articulated in McFadden. Lead paint is not hazardous when it remains embedded in a wall; it becomes so only when it is somehow released from the wall and ingested by humans. Therefore, McFadden cannot be fairly understood to declare that lead is not a pollutant when it is contained in the walls of a residence, but becomes so when leaded paint chips fall to the floor, because the focus of McFadden was to find coverage for lead paint-related injury. Indeed, McFadden is crystal clear in ruling that the pollution exclusion does not cover injury caused by “the presence of leaded materials in a private residence.” McFadden at 92. It does not limit its holding *191 to leaded materials fixed in the wall, and exclude leaded materials that fell from the wall to the floor.
Equally importantly, after McFadden, an objectively reasonable insured would expect that leaded materials in a private residence are not barred from coverage by the pollution exclusion. If an insurer after McFadden wished to exclude from coverage injury from leaded materials in a private residence, it could easily have revised the language of the pollution exclusion to define lead as a pollutant. But no such revision was made. Since injury from leaded materials in a private residence was not covered by the pollution exclusion in the policy interpreted in McFadden and since the language of that policy remained essentially unchanged when issued to First Kostas, it is reasonable to infer that the insurer had adopted the interpretation of that language in McFadden.[1]
Moreover, the distinction suggested by Dorchester is too fine to be useful in a business world where clarify regarding insurance coverage is critical. Pragmatically, a small contractor purchasing a “small contractors policy” like the one bought by First Kostas needs to know whether lead paint injury is covered or not, because, if not, it needs to determine whether to obtain separate pollution coverage or go uninsured for this risk. Indeed, clarity is especially important to a painting contractor, who removes leaded paint from the exterior and interior walls of homes routinely in its normal course of business. It is simply not helpful in obtaining the needed clarity for the law to declare that these risks are covered while the lead remains embedded in the walls but are not when they fall to the ground. McFadden enjoys the virtue of clarity and simplicity; injury from leaded materials in a private residence is covered unless excluded with language clearer than the usual pollution exclusion. The interpretation sought by the insurer would negate that clarity and simplicity, and replace it with distinctions more appropriate to Talmudic and Jesuitical scholars than to small businesses buying insurance coverage.
There is no dispute that the property damage here came from leaded materials in a private residence, which the Supreme Judicial Court does not find to be a “pollutant” under the language in the Policy at issue here. The fact that the leaded materials came from the exterior rather than the interior walls do not make a difference; they were still part of a private residence. Therefore, since the leaded materials were not “pollutants,” they cannot be excluded under the pollution exclusion clause.
IV. THE FAULTY WORKMANSHIP EXCLUSIONS
One of the four faulty workmanship exclusions argued by Dorchester plainly bars coverage in this case: Section B(l)(k)(5), which excludes “property damage to that particular part of real property on which [the insured]... is performing operations, if the property damage arises out of those operations.” Policy at 4. An objectively reasonable insured reading this language would know that it excludes coverage for damage to a home that it is painting when that damage is caused by its painting.
The claimants protest that the “particular part of real properly” on which First Kostas performed its work was the exterior of the house, which was painted adequately, not the interior, where the lead contamination occurred. This interpretation does not comport with the language of the exclusion, which speaks of “property damage to . . . the particular part of real property on which [the insured] ... is performing operations,” not property damage to the work itself (which is the subject matter of a different exclusion). More importantly, this argument has been considered and rejected by the Supreme Judicial Court. In Jet Line Services, Inc. v. American Employers Insurance, 404 Mass. 706 (1989), a petroleum tank blew up after the insured had cleaned and repaired it. The insured argued that a similar faulty workmanship exclusion did not apply because its employees had not cleaned the entire tank, but only a particular part of it. The Court rejected such sophistry;
We conclude that the words “that particular part of any property ... on which operations are being performed” refers to the entire tank and not just to the bottom of the tank that Jet Line personnel were cleaning at the moment of the explosion. Jet Line was retained to clean the entire tank, and it was the entire tank on which operations were being performed within the meaning of the policy language.
404 Mass. at 711. Similarly, in Lusalon v. Hartford Accident and Indemnity Co., 400 Mass. 767 (1987), the Court denied coverage to a masonry subcontractor for the damage it caused to windows and doors, particular property it had not worked on, rejecting the subcontractor’s argument that the exclusion did not apply because the injured property was not its work product. Id. at 770. See also Bond Bros. v. Robinson, 393 Mass. 546, 547-48 (1984) (interpreting the identical exclusionary language so as to deny coverage where a subcontractor’s faulty installation of reinforced steel and welded wire mesh caused the failure of a concrete foundation poured by the general contractor).
In short, damage to a neighbor’s home caused by First Kostas’ careless painting is covered; damage to the claimants’ home is not. A liability policy does not routinely warranty a contractor’s work or cover contractual claims for faulty workmanship.
To improve their chances of obtaining insurance coverage, the claimants maintain that there was no breach of contract here, because the outside painting was fine. Yet, if one believes the claimants’ allegations, it is plain that there was a breach of contract, because one cannot, with a straight face, argue that a contract to paint a house is fully and adequately performed by applying two clean coats of paint and contaminating the house with lead. Damages such as these are ordinarily borne by the contractor in order to satisfy customers or they may be covered by builder’s risk insurance or a performance bond, but they routinely *192 fall outside the scope of contractor’s liability insurance. See Commerce Insurance Co. v. Betty Caplette Builders, Inc., 420 Mass. 87, 92-93 (1995).
There is no need to consider the applicability of the other three faulty workmanship exclusions, because one such exclusion — Section B(1)(K)(5) — is fatal to the defendants’ claim. Since Section B(l)(k)(5) of the policy excludes coverage for the property damage claimed in the Chapter 93A letter, the allegations in that letter are not reasonably susceptible of an interpretation that they state a claim covered by the Policy. Consequently, the insurer owes no duty to defend or, a fortiorari, to indemnify.
ORDER
For the reasons stated above, it is hereby ORDERED that the plaintiff Dorchester Mutual Fire Insurance Company’s motion for summary judgment is ALLOWED and the claimaints’ cross-motion for summary judgment is DENIED.

 It is, of course, doubtful that a small painting contractor like First Kostas ever learned of the McFcudden holding. But it is nearly certain that insurers, with counsel paid to learn of such cases, were fully aware of the McFadden holding long before the First Kostas policy was issued.