Agnes, A.J.
These are consolidated actions for declaratory judgment that arise out of a motor vehicle incident in which the plaintiff, David Foley, suffered personal injuries as a result of the conduct of the defendant Robert Flannery. The plaintiff is a police officer with the Newbury Police Department. He was injured on March 13, 1996, in Newbury, Massachusetts while on duty and during an encounter with Mr. Robert Flannery, a fugitive from justice. Flannery, who moments earlier had collided with a third motor vehicle, fled the scene, and then lost control of his vehicle causing it to go off the road in the vicinity of Marshview Farms in Newbury. It was there that Flannery encountered the plaintiff who had pursued him after checking on the well being of the occupants of the vehicle struck by Flannery. The plaintiff was injured by Flannery when he entered Flannery’s motor vehicle to remove the keys from the ignition and, at the same time, Flannery entered his vehicle in an apparent attempt to flee the scene. Flannery was arrested and charged with a number of criminal violations. He has since defaulted.
The plaintiff David Foley made claims against Flannery’s insurance carrier, defendant Nationwide Mutual Insurance Company (hereafter, “Nationwide”) as well as against his own carriers, defendants Commercial Union Insurance Company (hereafter, “Commercial”) and Premier Insurance Company (hereafter, “Premier”). Plaintiffs claims were rejected. He then instituted a civil action against Nationwide in January 1998 and a civil action against Commercial and premier in March 1998. Nationwide added defendant Flannery as a Third-party Defendant. In April 1999, the actions were consolidated for all purposes. Defendant Flannery was defaulted by the court on March 29, 2000. An application for a judgment of default and for an assessment of damages also was filed, but has been stayed. The plaintiff and the three insurance companies involved in these actions have filed cross motions for summary judgment.
*221 BACKGROUND
The following facts are undisputed and are drawn from the defendant Nationwide’s Statement of Undisputed Facts.
1. The coverage terms and language of the Nationwide policy of insurance. Defendant Nationwide issued Flannery an insurance policy bearing policy number 357410 which provided automobile insurance for Flannery’s 1988 Cadillac automobile for the period between November 8, 1995 and November 8, 1996 (hereinafter the “Policy”). The Coverage Selections Page from Flanneiy’s Policy shows that Flannery had compulsory bodily injury coverage under Part 1 of the Policy in the amount of twenty thousand dollars ($20,000) per person, and forty thousand dollars ($40,000) per accident. The Coverage Selections Page from Flannery’s Policy also shows that Flannery had optional bodily injury coverage under Part 5 of the Policy in the amount of one hundred thousand dollars ($100,000) per person, and three hundred thousand dollars ($300,000) per accident.
With regard to the Policy limits shown for optional bodily injury coverage under Part 5 of the Coverage Selections Page, the limits shown are “the total limits [provided under] Compulsory Bodily Injury to Others (Part 1) and this part [Part 5). Part 1 ’’Bodily Injury to Others" of the Compulsory Insurance Section of the Policy provides, “Under this Part, we will pay damages to people injured or killed by your auto in Massachusetts accidents." Also, in Part 5, “Optional Bodily Injury to Others,” the Policy states that “Under this Part, we will pay damages to people injured or killed in accidents if you or a household member is legally responsible for the accident.”.
The policy defines an “Accident” as “an unexpected, unintended event that causes bodily injury or property damage arising out of the ownership, maintenance or use of an auto.” In an express exclusion to all optional coverages, the Policy states that “We will not pay under any of the Optional Coverages ... (6) for injury or damage that is intentionally caused by you, a household member or anyone else using your auto with your consent.”
2. The events giving rise to the plaintiffs injuries. At approximately 3:50 p.m. on March 13, 1996, Flannery was involved in a collision with another vehicle on Route 2 in Newbury, Massachusetts (the “Collision”). At the time of the Collision, Foley, an on-duty inspector with the Newbury Police Department was stopped in an unmarked police car at a stop sign at an intersection with Route 1 in Newbury. As he sat at the stop sign in the unmarked police car, Foley noticed Flannery’s vehicle approaching at a “high rate of speed for that area.” Foley then witnessed Flannery’s vehicle attempt to pass a bus, at which time Flannery was involved in the Collision with a brown Volvo station wagon (the “Volvo”) occupied by a woman and a baby in a car seat.
Rather than stop after the Collision, Flannery sped away at “a high rate of speed.”
Foley pulled his police car beside the Volvo and determined that the woman and the child did not appear to be seriously injured. Foley called for an ambulance, contacted the local Newbury police via radio, and began pursuing Flannery down Route 1 South with the police car’s siren and lights turned on.
During his two-mile pursuit, Foley reached speeds of ninety miles per hour until Flannery lost control of his vehicle and went off the side of the road in the area of Marshview Farms in Newbury. Foley brought his police car to a stop approximately one hundred (100) feet behind Flannery’s vehicle. Flannery then jumped out of his car and charged at Foley, who also exited his vehicle. Foley identified himself as a police officer and showed Flannery his badge. However, Flannery demanded to see additional identification. Foley therefore produced additional identification from his wallet.
During this time, Foley observed that Flannery’s eyes were glassy, his speech was slurred, and his breath emitted a strong odor of alcohol. Foley was attempting to stall and “double-talk” Flannery to calm Flannery and buy time until more police could arrive. Flannery had gotten so close to Foley that the men were ”[n]ose to nose.” Foley advised Flannery of his Miranda rights. Flannery then said something to the effect of “I’m out of here” and began to “walk back towards his car.”
Foley continued to engage Flannery in conversation and walked towards Flannery’s car with him ”[s]ide by side.” As the two men walked toward Flannery’s vehicle, Flannery was closer to the car on the “inside” as Foley was on the “outside.” As Foley and Flannery approached the vehicle, Flannery began to make “a dash for the car.”
Foley gave a fresh account of the occurrences leading to his alleged injuries in an incident report (“Incident Report”) written to Chief Robert S. Merry of the Newbury Police Department. In the Incident Report Foley wrote:
At this time, [Flannery] started moving towards his vehicle. I walked at a fast gait with him. The door was opened. I positioned myself in first and reached for the keys in the vehicle ignition (in an attempt to keep this obviously intoxicated subject from driving away). I turned the vehicle off. The subject pushed hard against my arm, pulling the ligaments in my right shoulder. At this time, I had obtained the keys and pulled my arm out. The subject got into the vehicle and tried to start the ignition with no keys. He seemed puzzled when the vehicle wouldn’t move. I waited patiently for the Newbury cruiser. (Emphasis added.)
After suit was filed and in his response to Nationwide’s fourth interrogatory, Foley offered this account of the events:
*222 I pursued him on foot back to the driver’s side of the Cadillac, which was still running. He then entered the driver’s door of the Cadillac, and was nearly fully seated and preparing to drive the automobile away. At the same time, I reached over him, halfway into the driver’s compartment myself. As he was attempting to drive away, I placed my fingers around the ignition key, switching off the engine, and removed the keys from the ignition. I was placed at an awkward angle in reference to him, with my back to him, my foot on the sideboard, and my arm and shoulder completely within the driver’s compartment. At that point, the operator of the Cadillac pushed violently against my arm, pulling the ligaments in my right shoulder. Nonetheless, I then retrieved the keys from the Cadillac. The operator then remained seated in the driver’s seat of the car and seemed puzzled that he could not drive it away.
Thereafter, during his deposition testimony, the plaintiff Foley testified as follows:
Q. Okay. The next sentence [of the Incident Report], I positioned myself in first and reached for the keys in the vehicle ignition (in an attempt to keep this obviously intoxicated subject from driving away).
A. Yes, sir.
Q. All right. Now, what do you mean when you say, I positioned myself in first?
A. We ... at this point ... at this point we’re now both . . . he’s now making a dash for the car. Okay. The door is open. He’s on the inside. He would be next to the chassis of the car. I would be on the outside.
Q. Okay. Meaning he’s on the inside track?
A. He’s on the inside track.
Q. Right.
A. We both get to the vehicle approximately or simultaneously together.
Q. Okay.
A. I’m putting my . . . my right foot inside. I’m reaching in. As I’m doing this, there is body contact with him to me. I have a sharp pain. I have my . . . my arm is inside by the column of the car.
Q. Okay.
A. I have body contact. . .
Q. He came up from behind you?
A. Well, we were there together. And what he did is he slid in the driver’s seat as I'm pulling the keys out.
Q. All right. Now, did the physical contact with this fellow occur to the front of your shoulder?
A. The back.
Q. The back of your shoulder?
A. Yes.
Q. Okay. The next sentence you write is, I turned the vehicle off?
A. Yes.
Q. What does that mean?
A. I turned the vehicle off.
Q. I know. But what does it mean? Like does that mean you turned . . .
A. I turned the key and took the keys out.
Q. Okay.
A. This was all happening within a . . .
Q. Okay.
A. . . . within a split second.
Q. All right. I mean, we all know what that means, but. . .
A. I turned the vehicle off, and I ... I secured the keys in . . . physically in my hand and slipped my arm out, which was now in extreme pain.
Q. Okay. I turned the vehicle off. You, then write, The subject pushed hard against my arm, pulling the ligaments in my right shoulder, right?
A. Yup.
Q. Now, those two sentences stand side by side. Did he push hard against your arm before you turned the vehicle off or after you turned the vehicle off?
A. I would say while I was turning it off.
Plaintiff Foley also was asked at his deposition about his characterization of the contact by Flannery, as contained in his earlier Answers to Interrogatories. Foley testified:
Q. Are the words pushed violently against your arm pulling the ligaments in your shoulder your words? A. I believe so.
Q. So did it feel as though he pushed violently against your arm?
A. I believe so.
When Flanneiy realized that Foley had succeeded in removing the keys, he again exited the car and began screaming and demanding the keys from Foley. Flannery persisted and began “striking and pushing” Foley. Because of the injury to Foley’s shoulder, which occurred earlier when Flannery pushed him from behind, Foley says he was not able to raise his right arm to defend himself later. Foley did try to grab Flannery and “wrestle him around” in an attempt to calm him down.
Approximately three (3) to five (5) minutes later, Officer Croteau of the Newbury Police Department (“Croteau”) arrived in a marked police cruiser with its lights and sirens operating. Foley and Croteau discussed the circumstances and Foley’s opinion of Flannery’s intoxication as Flannery was “(w)aving his arms, moaning and groaning, yelling, screaming . . . and basically exhibiting conduct of a severe drunk.” Further, Foley advised Croteau to take out charges *223 against Flannery for assault and battery on a police officer.
3. The arrest and prosecution of defendant Flannery. Defendant Flannery was handcuffed and secured into the Newbury cruiser as additional backup arrived. Flannery was arrested and charged with Operating Under The Influence of Liquor (M.G.L.c. 90); leaving an accident scene involving personal injury but not death (M.G.L.c. 90); operating a motor vehicle negligently so as to endanger (M.G.L.c. 90, §24); and operating a motor vehicle without a license (M.G.L.c. 90, §10). Additionally, pursuant to Foley’s request, Flannery was charged with assault and battery on a police officer (M.G.L.c. 265, §13D) (7th or subsequent offense). Flannery was also charged with another count of assault and battery on a police officer (M.G.L.c. 265, § 13D) (eighth or subsequent offense), for grabbing and pushing Staff Sargent William McCarthy while held at the Newbury Police station, and vandalizing a county building (M.G.L.c. 266, §97), for kicking and removing a toilet from a jail cell, which flooded the cell floor.
Flannery failed to appear in court for a pre-trial hearing at the Newbury District Court after posting cash bail. A complaint was filed for Flannery’s violation of M.G.L.c. 276, §82A, and a warrant was issued. Flannery has not appeared in court to face any of these charges, and remains in default.
Prior to the events of March 13, 1996, Flannery had previously been found guilty of operating under the influence of liquor (M.G.L.c. 90, §24), and operating a motor vehicle after his license had been suspended (M.G.L.c. 90, §23), in Billerica, Massachusetts on November 14, 1986. He also had been found guilty of larceny of a motor vehicle or trailer (M.G.L.c. 266, §28), and operating a motor vehicle after his license was revoked for drunk driving (M.G.L.c. 90, §23), in Andover, Massachusetts on October 6, 1989. Also, Flannery had been found guilty for disturbing the peace (M.G.L.c. 272, §53), and malicious destruction of property worth more than two hundred and fifty dollars ($250) (M.G.L.c. 266, §127), in Andover, Massachusetts on November 26, 1989. Finally, Flannery had been found guilty of two (2) counts of assault and battery on a police officer (M.G.L.c. 265, §13D).
4. The plaintiffs claim. The plaintiff Foley sent a letter to Nationwide notifying Nationwide of his claim in February of 1997. Nationwide responded to Foley’s claim by letter, denying coverage for the alleged actions of Flannery.
DISCUSSION
1. The standard for summary judgment under Mass.R.Civ.P. 56. Summary judgment should be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). Also, summary judgment maybe granted against the moving party, and maybe granted as to certain issues but not others. See Community Bank v. Dawes, 369 Mass. 550, 553 (1976).
The moving party bears the burden of establishing the absence of a triable issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once this is done, the burden shifts to the party opposing summary judgment who must allege specific facts establishing the existence of a genuine issue or issues of material fact. Id. In assessing whether each party has met its burden, the court is not permitted to weigh the evidence, to determine the credibility of any witnesses or make any findings of fact. Kelly v. Rossi, 395 Mass. 659, 663 (1985). Moreover, “[t]he evidence is ‘considered with an indulgence in the [opposing party’s) favor.’ ” Anthony's Pier Four v. Crandall Dry Dock Engineering, Inc., 396 Mass. 818, 822 (1986), quoting National Ass'n of Gov’t Employees v. Central Broadcasting Corp., 379 Mass. 220, 231 (1979), cert. denied, 446 U.S. 935 (1980). However, “[a] complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial.” Kourouvacilis, supra at 711, citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether there are genuine issues of material fact, the court may consider the pleadings, depositions, answers to interrogatories, admissions on file and affidavits. Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The party opposing summary judgment cannot defeat the motion simply by resting on the pleadings and mere assertions that there are disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). If the moving party does not bear the burden of proof at trial, it may demonstrate the absence of a genuine issue of material fact by submitting evidence that negates an essential element of the other’s party’s claim, or by showing that the other party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
2. The policy of insurance issued to defendant Robert Flannery by Nationwide was in effect and had not been cancelled prior to the incident in question. Defendant Nationwide has alleged that the policy of insurance issued to defendant Flannery (No. 357410) was cancelled three days before the incident, and that it is not under any obligation to provide coverage to the plaintiff even if he suffered injuries as a result of an otherwise covered accident. The record contains a coy of a statutory notice of cancellation dated February 14, 1996 which Nationwide maintains was mailed to its insured, the defendant Robert Flannery, as well as to the Registry of Motor Vehicles, at least twenty days before the intended date of cancellation. However, at oral argument counsel for Nationwide appropriately conceded that it cannot produce the “certificate of mailing receipt” or a copy of the notice mailed to the *224 Registry of Motor Vehicles required by G.L.c. 175, §113A(2). See also G.L.c. 175, §§187C & 187D.
The defendant Nationwide argues that there is circumstantial evidence in the record which permits a finding that the statutory notice of cancellation was mailed to its insured. Nationwide relies on the deposition of a technical support analyst, Cherie Pittman, who testified that the business practice and custom of Nationwide included an automated system that generated a first notice and then a statutory notice of cancellation for mailing to the insured when Nationwide failed to receive required payments on its policies of insurance. When asked about her knowledge of the facts and circumstances relating to this case, Ms. Pittman testified that “I saw the statutory notice of cancellation, so I know it was processed.” Defendant Nationwide’s Opposition to Plaintiffs Foley’s Omnibus Motion for Summary Judgment at 17-18 & Exhibit A (Pittman Deposition). Nationwide relies on a decision by the Appellate Division of the District Court in Rowe v. Middlesex Ins. Co., 1994 Mass. App. Div. 209 (1994). However, the Rowe case is distinguishable. There, the insured received actual written notice of cancellation and responded by tendering less than the full amount of the payment that was due. The insurer, in turn, sent a second letter to the insured and informed her that partial payment was not sufficient to prevent the cancellation. No subsequent written notice was sent to the insured. On these facts, the Appellate Division concluded that the insurer had met its obligation to its insured under the statute by demonstrating that the insured had received actual notice, and its obligation to establish notice to the Registry of Motor Vehicles was established by evidence of the insurer’s “business custom” with respect to sending notices to the Registry of Motor Vehicles. Rowe, supra citing Prudential Trust Co. v. Hayes, 247 Mass. 311, 315 (1924).
In the present case, unlike in Rowe, there is no direct evidence that the insured received notice that his policy of insurance was cancelled. Moreover, there is no direct evidence in the record before me of a mailing that would bring into play the inference of receipt by the addressee. See Prudential Trust Co., supra at 314. In any case, in order for a cancellation to be valid in Massachusetts, legal requirements such as those set forth in the statutes “must be strictly complied with.” Liberty Mutual Insurance Company v. Wolfe, 7 Mass.App.Ct. 263, 265 (1979) (citations omitted). On the record before me, I rule that the policy of insurance in question issued by defendant Nationwide was in effect and had not been cancelled on the date of the incident in which defendant Robert Flannery caused injury to plaintiff David Foley.
3. The plaintiff Foley was injured as a result of an accident caused by defendant Nationwide’s insured, the defendant Flannery. Under the policy of insurance between defendant Nationwide and defendant Flannery, coverage is provided for people who are Injured in “accidents” caused by the insured. The policy defines an “accident” as "an unexpected, unintended event that causes bodily injury or property damage arising out of the ownership, maintenance or use of an auto.” It is the position of the defendant Nationwide and the other insurers that because intentional conduct and negligent conduct are mutually exclusive concepts within the realm of the law of torts, see Waters v. Blacksheer, 412 Mass. 589, 590 (1992) (child who places a firecracker in another’s sneaker and then lights it was not negligent, but was intentional conduct even if the child did not intend or foresee the extent of the harm), and since the conduct of the defendant Flannery in this case was intentional in the sense that it was volitional and in all likelihood criminal as well, that the defendant's Flannery’s conduct was, as a matter of law, outside the definition of an “accident” as that term is used in the policy of insurance. However, this analysis overlooks the fact that volitional conduct can give rise to liability for intentional torts and criminal culpability and yet be considered accidental for purposes of insurance coverage.
In Worcester Ins. Co. v. Fells Acres Day School, Inc., 408 Mass. 393, 411 (1990), the Supreme Judicial Court observed that,
Generally, injuries resulting from reckless conduct do not fall into the category of “expected or intended” injuries, but are considered “accidental” and thus are covered under insurance policies. “Our cases have concluded that an injury is nonaccidental only where the result was actually, not constructively intended i.e., more than recklessness.” (Emphasis added.)
The example used by the court in Fells Acre to illustrate this point was Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 86 (1984). In that case, the Supreme Judicial reversed the grant of summary judgment in favor of the insurer that had been awarded by the trial judge and upheld by the Appeals Court in circumstances in which the insured was injured as she was operating her automobile when a juvenile threw a piece of blacktop at her automobile which penetrated the windshield causing her to suffer facial cuts, and her rear seat passenger to suffer a fractured skull. The homeowner’s insurance policy maintained by the juvenile’s parents provided coverage for bodily injury caused by an accident resulting from the activities of any insured, but excluded from that coverage, and thus from the meaning of the term “accident,” “bodily injury . . . which is either expected or intended from the standpoint of the insured.” Id. at 82.
In interpreting this language in the Abernathy case, the Supreme Judicial Court carefully considered the meaning of the policy language. The court noted that policy language which excludes coverage for injuries resulting from “intended" harm does not reach “the volitional act of an insured ... if the insured does not *225 specifically intend to cause the resulting harm or is not substantially certain that such harm will occur.” Id. at 84. The question then was whether a different and broader exclusion from coverage resulted from the addition of the term “expected.” The Supreme Judicial Court noted that some courts have interpreted the word “expected” to encompass both intentional and reckless conduct, i.e., to apply to exclude coverage when the insured specifically intended the result as well as when the insured knew or should have known that there was a substantial probability that the result would come about. Id. at 84-85. Although the Abernathy court concluded that the term “unexpected” was ambiguous and that resort should be had to a familiar rule of construction that resolves ambiguities against the insurer in such cases,[1] the primary factor in the court’s reasoning was what may be described as a tradition in the Massachusetts cases “that an injury is nonaccidental only where the result was actually, not constructively, intended, i.e., more than recklessness. This standard requires a showing that the insured knew to a substantial certainty that the bodily injury would result.” Id. at 86. Accord, Sheehan v. Goriansky, 321 Mass. 200, 204-05 (1947) (explaining that the traditional meaning of an ‘accident" is “an unexpected happening without intention or design” and that it includes both conduct that is negligent as well as conduct that is wanton or reckless even though the latter is said to be the “legal equivalent” of intentional conduct).
Further illumination on the distinction between accidental and non-accidental conduct in the context of coverage language in policies of insurance was provided in Newton v. Krasnigor, 404 Mass. 682 (1989). In Krasnigor, the Supreme Judicial Court held that property damage resulting from the acts of several youths who set fires in a school building was excluded from coverage under the parents’ homeowners policy because the property damage was “expected or intended by the insured.” The Court reasoned that evidence that the youths intended to set the fires implied, as a matter of law, their intent to cause some property damage, although not necessarily the severity of the damage that actually resulted from their conduct, and that, therefore, the conduct of the youths could not be deemed to have been an accident. Id. at 685. Accord, Terrio v. McDonough, 16 Mass.App.Ct. 163, 169 (1993) (pushing another down a flight of stairs could not be deemed an accident). However, the Court noted that this reasoning was not based simply on an application “of the tort principle that one is considered to have intended the natural and ordinary consequences of one’s voluntary act.” Id. at 686 n. 7. Instead, in a critical passage that serves to explain the holding in Abernathy, the Supreme Judicial Court stated that “[i]t is a much more narrow gauge that recognizes the correlation [between act and intent] only where reason mandates that from the very nature of the act, harm to the injured party must have been intended.” Id. at 686 n. 7, quoting United States Fidelity & Guar. Co. v. American Employer's Ins., 159 Cal.App.3d 277, 289-91 (1984), quoting Home Ins. Co. v. Neilson, 165 Ind.App. 445, 450 (1975).
Based on the reasoning of the Supreme Judicial Court in the Sheehan, Abernathy, Fells Acre and Krasnigor cases, the crucial question in determining whether the injuries suffered by the plaintiff were the result of an accident caused by the insured, i.e., that the injuries resulted from “an unexpected, unintended event,” is whether the insured knew to a substantial certainty that the plaintiff would suffer bodily injury. The record before this court indicates that as the plaintiff Foley and the defendant Flannery stood nose to nose outside Flannery’s vehicle, which at the time had its engine running with its door open, the defendant Flannery, who appeared to be intoxicated or otherwise impaired,[2] rushed to enter the vehicle (presumably to escape) while, at the same time, the plaintiff, David Foley, reached inside the vehicle, through the same door, in order to remove the keys from the ignition. Although the conduct of the insured was reckless, was volitional, and may in some sense even be described as intentional,[3] it cannot be said that the defendant Robert Flanneiy knew to a substantial certainty that by trying to reenter his motor vehicle and presumably make good on his escape he would cause the plaintiff to suffer bodily injury to his shoulder.[4]
4. The accident caused by defendant Nationwide’s insured, the defendant Flannery, arose out of the use of an automobile. In order for conduct of defendant Flannery to come within the scope of the coverage under the defendant Nationwide’s policy of insurance, it must also be determined that the accident he caused arose out of the ownership, maintenance or use of an automobile. This phrase “does not refer to all circumstances in which the injury would not have occurred ‘but for’ the involvement of a motor vehicle." Rischitelli v. Safety Insurance Company, 423 Mass. 703, 704 (1996). There must be a causal connection between the use of the automobile and the accident, although “there is no requirement of causation which would amount to proximate cause in the ordinary tort sense.” Liberty Mutual Ins. Co. v. Agrippino, 375 Mass. 108, 115 (1978).
Motor vehicle insurance coverage applicable to certain events arising out of the ownership, operation, or use of a vehicle does not extend to injuries sustained when, following a collision or other motor vehicle incident, one operator gets out of his car and simply attacks the operator or a passenger from another vehicle, Rischitelli v. Safety Insurance Company, supra, or when an insured sits in his vehicle and intentionally fires a gun at a passer-by, Sabatinelli v. Traveler’s Insurance Co., 369 Mass. 674, 677 (1976). Coverage has been found to exist when the insured threw an object at another from a moving vehicle, Assetta v. Safety Insurance Company, 43 *226 Mass.App.Ct. 317, 319 (1997), and when a school bus driver sexually assaults a passenger on the bus. Roe v. Lawn, 418 Mass. 66, 70 (1994). An instructive case is Travelers Ins. Co. v. Safeguard. Ins. Co., 346 Mass. 622 (1964), in which the court ruled that the insurer was not obligated to provide coverage. In, Traveler's, the court held that a grocery clerk who carried a customer’s bags to his (the customer’s) car and proceeded to close the car door on the customer’s hand had not used the insured’s motor vehicle so as to oblige the insurer to defend him in an action that could be brought against him by his employer.
In reaching this result, the Supreme Judicial Court pointed out that the act of loading and unloading vehicles used in the regular course of soliciting trade or delivering merchandise is well settled as a “use" or “operation” of the vehicle, but a use such as that made by the grocery clerk “was too casual and too remote from the operation of the vehicle” to qualify the store’s employee as an insured. In the present case, defendant Flannery was in regular and continuous use and operation of the vehicle at the time of the incident. There was a direct and immediate connection between the vehicle, the conduct of the plaintiff Foley in reaching inside to remove the keys, and the simultaneous conduct of the defendant Flannery in trying to get past the plaintiff and into the vehicle as he sought to escape from the scene. The critical events took place within the passenger compartment of defendant Flannery’s vehicle. Here, as in Assetta v. Safety Insurance Co., 43 Mass.App.Ct. 317, 319 (1997), the defendant Flannery’s vehicle was directly involved in causing the injury to the plaintiffs shoulder.
5. The plaintiff Foley is not barred from access to coverage under policies of insurance issued by defendants Traveler's and Premier. Defendants Traveler’s and Premier maintain that the plaintiff is barred from access to uninsured or underinsured benefits available under policies they issued to the plaintiff for the same reasons advanced by defendant Nationwide. Thus, what has been said above, disposes of the issues raised by these other defendants.
ORDER
For the above reasons, it is hereby ORDERED and ADJUDGED that the policy of insurance in question issued by defendant Nationwide to defendant Robert Flannery was in effect and was not cancelled on March 13, 1996.
The defendant insurers, Nationwide, Traveler’s and Premier, have not established that the injuries suffered by the plaintiff David Foley on March 13, 1996 based on the conduct of defendant Robert Flannery are excluded from coverage on the ground that they did not result from an accident, as that term is defined in the applicable policies of insurance issued by defendants Nationwide, Traveler’s and Premier, and that the plaintiff David Foley is barred from accessing any coverages that are available to him under the said policies on grounds that his injuries were not the result of an accident. Accordingly, it is ORDERED that the defendant insurers’ motions for Summary Judgment are DENIED.
With regard to the plaintiff Foley’s motion for summary Judgment, ”[i]n cases where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate. In such cases, ‘[m]uch depends on the credibility of the witnesses testifying as to their own states of mind. In these circumstances, the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue.’ ” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). However, this case presents an appropriate exception to this general rule.
At oral argument, the parties agreed that it is unlikely that a fact-finder will hear any evidence from the defendant Robert Flannery who is a fugitive from justice and a person with a lengthy criminal record. The only other person with direct knowledge of the events is the plaintiff David Foley. While his various accounts of the incident vary slightly, they are in all material respects consistent. Thus, there is no dispute over material facts and reasonable prospect for gathering additional, relevant evidence. Accordingly, and based on the foregoing, it is further ORDERED and ADJUDGED that the shoulder injuries suffered by the plaintiff David Foley on March 13, 1996 resulted from an “accident,” as that term is defined in the applicable policies of insurance issued by defendants Nationwide, Traveler’s and Premier, that was caused by defendant Robert Flannery. Therefore, the plaintiff David Foley’s Motion for Summary Judgment is ALLOWED.

 The insurers in the present case correctly point out that while it was appropriate for the Supreme Judicial Court in Abernathy to resolve any ambiguity in the language of a homeowner’s policy of insurance against the insurer as the maker of the contract, see Vappi & Co. v. Aetna Casualty & Sun Co., 348 Mass. 427, 431 (1965), this rule does not apply in the context of automobile policies which are approved by the state’s Division of Insurance. Gomes v. Metropolitan Property & Cas. Ins. Co., 45 Mass.App.Ct. 27, 31 (1998). Yet, there is certainly nothing in Abernathy or any other authoritative Massachusetts case that suggests that the term “unexpected” is not ambiguous. An application of the “fair meaning” principle, see Gomes, supra, does not lead to a result in favor of the insurers. It is my view that the Supreme Judicial Court would reach the same conclusion about the legal significance of the term “unexpected” in the context of the insurance policy at issue in the presence case as it did in Abernathy even without the benefit of a “tie-breaker” such as a canon of construction that directs that ambiguous terms in a contract should be interpreted against the maker.

 The mental state of the insured may be an important factor in determining whether he intended to cause bodily injury in this context. Evidence that the defendant Robert Flannery may have lacked the capacity to act with the requisite intent to cause bodily injury to the plaintiff due to alcohol or drug intoxication weighs against a determination that the policy language excludes coverage. See Hanover Ins. Co. v. Talhouni, 413 Mass. 781, 785-86 (1992) (“[E]vidence of vol *227 untary intoxication is relevant to determining the presence or absence of intent with reference to an exclusion clause”).

 See Preferred Mutual Insurance Co. v. Gamache, 42 Mass.App.Ct. 194, 199 n.7, affirmed, 426 Mass. 93, 95 (1997) (noting that the term “intentional" and the phrase “intentional act” do not have a fixed legal meaning and can be understood to refer to conduct that is ‘accidental" within the meaning of that term in an insurance policy).

 As the Supreme Judicial Court noted in Preferred Mutual insurance Co. v. Gamache,, 426 Mass. 93, 95 (1997), “insurers can deal with the problem created by cases like this one by drafting appropriately worded exclusions for injuries to a third party resulting from an insured’s intentional torts or criminal acts. See, e.g., Allstate Ins. Co. v. Sowers, 97 Or.App. 658, 660 (1989) (injuries sustained by third party when insured resisted arrest excluded under a provision denying coverage for the insured’s ‘criminal acts')."